UNITED STATES of America,
Appellee,

v.

Milton SILVERMAN, Defendant-
Appellant.

Nos. 494 and 561, Dockets 33584
and 34392.

United States Court of Appeals,
Second Circuit.

Argued Jan. 26, 1970.

Decided July 1, 1970.

Moore, Circuit Judge, dissented in part.

Simon H. Rifkind, New York City, (Paul, Weiss, Goldberg, Rifkind, Wharton & Garrison, New York City, Edward N. Costikyan, and Theodore W. Striggles, New York City, of counsel), for defendant-appellant.

Jack Kaplan, Asst. U. S. Atty., New York City, (Whitney North Seymour, Jr., and Robert M. Morgenthau, U. S. Attys., for the Southern District of New York, New York City, Elkan Abramowitz, Asst. U. S. Atty., New York City, of counsel), for appellee.

Before MOORE, FRIENDLY and HAYS, Circuit Judges.

MOORE, Circuit Judge:

Milton Silverman appeals from his conviction on an eighteen-count indictment and from the denial of his motion for a new trial. The first eight counts of the indictment charged Silverman with the conversion of union funds which were paid to printing companies for the benefit of a political campaign. Count nine involved an expenditure of union funds by Silverman at a union convention. The next four counts (ten through thirteen) charged payments of union funds to Silverman for his use in awarding "Christmas gratuities." Count fourteen charged embezzlement of the proceeds from the sale of an asset of an employee welfare fund. Count fifteen involved the reporting on a Labor-Management Report of the political printing expenditure in count one. False report-

ing was also charged in counts sixteen and seventeen, involving the payments described in counts ten through thirteen. The final count charged the making of false entries in the books and records of the unions.

The jury found Silverman guilty on all counts except counts sixteen and seventeen. Silverman was sentenced to four months to be served concurrently on counts one through fifteen and four months to be served consecutively on count eighteen. He was also fined $1,000 on each of the sixteen counts upon which he was found guilty.

The facts as to each of the counts (except counts nine and fifteen as to which no challenge to the sufficiency of the evidence is made) will be more fully discussed below. It is sufficient for purposes of introduction to give a general background only. In 1965 and 1966 Milton Silverman was President of Local 810, International Brotherhood of Teamsters; Business Manager of Local 1614, International Brotherhood of Electrical Workers; and a Trustee and the Administrator of United Wire, Metal and Machine Welfare Fund and United Wire, Metal and Machine Pension Fund. These four affiliated labor organizations had common headquarters in Manhattan and

were governed by interlocking slates of officers. The organizations had grown out of a predecessor founded by Silverman twenty-four years earlier. Local 810 had a membership of 10,000 and Local 1614 had 3,500 members. They had collective bargaining agreements with approximately 300 employers in New York and New Jersey. Local 810 had net assets of about $200,000 while Local 1614 carried a deficit of around $51,000. Each local shared in the joint welfare fund, which had assets of $10 million, and the joint pension fund, which had assets of $6 million.

### The Sufficiency of the Indictment

Silverman argues that the convictions on counts one through fifteen of the indictment must be reversed because (1) these counts failed to state an offense, (2) the court lacked jurisdiction and (3) the court allowed an impermissible amendment to the indictment. These arguments are based upon the proposition that the indictment failed to allege that the unions were involved in interstate commerce. The indictment, tracking the language of the statute,[1] states that:

"[T]he defendant, unlawfully, wilfully and knowingly, directly and in-

---

I. 29 U.S.C. § 501(c) (1964) provides:
"Any person who embezzles, steals, or unlawfully and willfully abstracts or converts to his own use, or the use of another, any of the moneys, funds, securities, property, or other assets of a labor organization of which he is an officer, or by which he is employed, directly or indirectly, shall be fined not more than $10,000 or imprisoned for not more than five years, or both."
29 U.S.C. § 402 (1964) supplies definitions which are applicable to terms used in the Labor-Management Reporting and Disclosure Act. Subsections (i) and (j) (1) provide in pertinent part:
" 'Labor organization' means a labor organization engaged in an industry affecting commerce * * *."
"A labor organization shall be deemed to be engaged in an industry affecting commerce if it—(1) is the certified representative of employees under the provisions of the National Labor Relations Act, * * *"

Counts fourteen and fifteen of the indictment are alleged to be subject to similar charges of error. Count fourteen follows the statutory language in 18 U.S.C. § 664 (1964). That section provides:
"As used in this section, the term 'any employee welfare benefit plan or employee pension benefit plan' means any such plan subject to the provisions of the Welfare and Pension Plans Disclosure Act."
The Welfare and Pension Plans Disclosure Act provides, at 29 U.S.C. § 303 (a) (1964), that it applies to
"any employee welfare or pension benefit plan if it is established or maintained by any employer or employers engaged in commerce or any industry or activity affecting commerce or by any employee organization or organizations representing employees engaged in commerce or any industry or activity affecting commerce or by both."
Count fifteen alleges a violation with respect to documents required to be filed

directly, did embezzle, steal, abstract and convert, to his own use, and the use of another monies, funds, securities, property and other assets of a labor organization of which he was an officer and by which he was employed, to wit, Local 810, International Brotherhood of Teamsters and Local 1614, International Brotherhood of Electrical Workers, as hereinafter set forth.

[Dates and amounts involved in counts one through thirteen omitted]

(Title 28, United States Code, Section 501(c), Title 18, United States Code, Section 2)"

There is no dispute that there was sufficient proof of the requisite connection with interstate commerce. It was established that both unions were certified representatives of employees under the provisions of the National Labor Relations Act. Pursuant to 29 U.S.C. § 402(j) (1), this fact requires that the unions shall be deemed labor organizations engaged in an industry affecting commerce. Nor is there any dispute that the jury was properly charged that it must find the unions to be labor organizations engaged in an industry affecting commerce in order to return a verdict of guilty.

Rule 7(c) of the Federal Rules of Criminal Procedure requires that the indictment contain "a plain, concise and definite written statement of the essential facts constituting the offense charged." This requirement performs three constitutionally required functions. It permits the accused "to be informed of the nature and cause of the accusation" as required by the Sixth Amendment. It prevents any person from being "subject for the same offence to be twice put in jeopardy of life or limb" as required by the Fifth Amendment. Finally, it preserves the protection given by the Fifth Amendment from being "held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury." 8 Moore, Federal Practice ¶7.04 at 7–15 (1969). On appeal, Silverman does not protest that the first two of these functions have not been fulfilled. He was adequately informed of the specific accusations and thus able to prepare his defense. The crime was stated definitely enough to permit a plea of former jeopardy if the acts were made the subject of a later charge. However, he contends that the third function has not been fulfilled. Invoking the legal history of the grand jury as a buffer against tyranny, he states that an allegation of each essential element of a crime must be in the indictment "as a testament to its having been before the grand jury." Applt's Brief at 21.

The policy underlying the requirement of specificity in the indictment is similar to that which forbids the amendment of an indictment without resubmission to a grand jury. It is to prevent the usurpation of power by the court and prosecutor in allowing a defendant to be convicted "on the basis of facts not found by, and perhaps not even presented to, the grand jury which indicted him." Russell v. United States, 369 U.S. 749, 770, 82 S.Ct. 1038, 1050, 8 L.Ed.2d 240 (1962). This policy is effectuated by preventing the prosecution from modifying the theory and evidence upon which the indictment is based. See generally, 8 Moore, Federal Practice ¶7.05[3]. The question presented on this appeal is whether the indictment reveals that all the essential elements for conviction were presented to the grand jury, and deliberated upon and charged by them. We must also decide whether the prosecutor has attempted to rely at the trial upon theories and evidence that were not "fairly embraced in the charges made in the indictment." Russell v. United

---

with the Secretary of Labor under the provisions of 29 U.S.C. §§ 431–440 (1964). It is provided by 29 U.S.C. § 431(b):

"Every labor organization shall file annually with the Secretary [certain financial reports therein described]."

The definition of "labor organization" is given above.

States, 369 U.S. 749, 793, 82 S.Ct. 1038, 1062 (1962) (Harlan, J., dissenting).

■■ The indictment uses the term of art, "labor organization," and then specifies two particular labor organizations by referring to Locals 810 and 1614.[2] An indictment must be read to include facts which are necessarily implied by the specific allegations made. United States v. Martell, 335 F.2d 764, 765–766 (4th Cir. 1964); United States v. Varlack, 225 F.2d 665, 669–670 (2d Cir. 1955); Hewitt v. United States, 110 F.2d 1, 5–6 (8th Cir.), cert. denied, 310 U.S. 641, 60 S.Ct. 1089, 84 L.Ed. 1409 (1940); Hagner v. United States, 285 U.S. 427, 431–433, 52 S.Ct. 417, 76 L.Ed. 861 (1932); Grant v. United States, 291 F.2d 746, 748–749 (9th Cir.), cert. denied, 368 U.S. 999, 82 S.Ct. 627, 7 L.Ed. 2d 537 (1961); Gonzales v. United States, 286 F.2d 118, 120 (10th Cir.), cert. denied, 365 U.S. 878, 81 S.Ct. 1028, 6 L.Ed.2d 190 (1960); Finn v. United States, 256 F.2d 304, 306–307 (4th Cir. 1958).[3] Just as the use of the words "labor organization" in the statutory section defining the criminal offense involved necessarily implies the fact that the labor organization is engaged in an industry affecting commerce pursuant to 29 U.S.C. § 402(i), so the use of that term of art in the indictment necessarily implies that the essential element of interstate commerce is charged in the indictment. To contend otherwise would be to argue that the defendant was not sufficiently informed of the charges against him to allow preparation of a defense and that he could not be protected from being later placed in jeopardy for the same acts. Such arguments are concededly not presented by this case since Silverman was not prejudiced in such a manner. We must conclude that the indictment, as drafted, was sufficient to charge the essential element of interstate commerce.

Even though the indictment is drafted to charge the essential elements, the question remains whether on its face it presents evidence which assures us that such essential elements were presented to the jury and deliberated upon by them in returning the indictment. Cf. Russell v. United States, 369 U.S. 749, 770–771, 82 S.Ct. 1038, 8 L.Ed.2d 240 (1962). The presence of such evidence would insure that the defendant is not tried upon a theory or evidence which was not fairly embraced in the facts upon which the grand jury based its charges. The events described in the indictment were quite specific as to the dates of the transactions, the amounts involved and the parties from whom the funds were taken. Such allegations were sufficient to guard against giving improper discretion to the court and the prosecutor to vary the trial proof from the theory upon which the indictment was based. This is not a case wherein the indictment alleged facts showing one violation of federal law

2. A similar term of art is used in count fourteen ("employee welfare benefit plan").

3. We distinguish United States v. Cox, 285 F.Supp. 367 (E.D.Wis.1968) and Walker v. United States, 342 F.2d 22, 26–27 (5th Cir.), cert. denied, 382 U.S. 859, 86 S.Ct. 117, 15 L.Ed.2d 97 (1965), cited by the defendant, upon the ground that there was no allegation present in those cases from which the essential element in question could be necessarily implied. We do not regard United States v. Pearce, 275 F.2d 318, 324 (7th Cir. 1960) or United States v. Gordon, 253 F.2d 177, 179–180 (7th Cir. 1958) to be contrary to the result here because the allegations of interstate commerce in the questioned counts are not implied by reference to another count, i. e., count eighteen, but rather by the presence of an allegation in the challenged counts themselves. In United States v. Psoinos Construction Co., 282 F.Supp. 473 (D. Mass.1968) the indictment alleged that an employer had employees employed in an industry affecting interstate commerce, but failed to allege that the union sought to represent those employees who were so employed. Since the union may have sought to represent only those employees not so employed, the indictment was held insufficient to charge a crime under 29 U.S.C. §§ 186(a) (2), (d) (1964). This case is not contrary to our result since the allegation in question could not be necessarily implied by those present in the indictment.

(interference with interstate importation of sand) and proof was allowed at trial of another violation (interference with interstate importation of steel). Stirone v. United States, 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960). A situation similar to *Stirone* would be presented if the indictment had alleged that Silverman was an officer of Local 810 only and a conviction were permitted on proof that funds of Local 1614 had been embezzled. Nor is this a case wherein the grand jury might have relied upon specific evidence showing a violation of federal law (deception of the Comptroller of the Currency) which the trial judge permitted to be stricken from the indictment at trial. Ex parte Bain, 121 U.S. 1, 7 S.Ct. 781, 30 L.Ed. 849 (1886). A situation similar to *Bain* would be presented if the trial judge had amended the indictment at trial to delete reference to one of the two Locals. No one could suppose that the prosecutor would be free to roam at large in proving elements of the crime so explicitly stated. This statement is also true with respect to the allegation of interstate commerce. The connection with interstate commerce upon which the indictment must rest is that the specific unions named were "labor organizations" in the statutory sense. The specification of the unions involved protects Silverman from the evils of facing charges not made before the grand jury.

Evidence that the specific allegation of interstate commerce was presented to the grand jury is not absent from the face of the indictment. In count eighteen the indictment specifically refers to "a labor organization engaged in an industry affecting commerce, to wit, Local 810, International Brotherhood of Teamsters, and Local 1614, International Bortherhood of Electrical Workers." It would be absurd to think that the grand jury could have found such a fact on count eighteen and have been in ignor-

ance of it when they indicted on the other counts.[4]

■ The arguments that the court lacked jurisdiction and made an impermissible amendment to the indictment may be quickly disposed of. Lack of jurisdiction would exist only if the indictment did not charge a federal crime through failure to allege a connection with interstate commerce. An impermissible amendment would have been made only if the judge's charge had allowed or required proof of elements not charged in the indictment. Since we have decided that the words, "labor organization * * *, to wit, Local 810, International Brotherhood of Teamsters and Local 1614, International Brotherhood of Electrical Workers," can be read to allege and require proof of the essential element of interstate commerce, there is no merit in Silverman's contentions on these points.

*Counts One through Eight—The "PO-LITICAL CONTRIBUTIONS"*

During the summer of 1965, Silverman was approached by Stanley Steingut, a Brooklyn Democratic leader, who asked for financial support for the candidacy of Abraham Beame and his running mates in the 1965 mayoralty campaign. Silverman agreed. Pursuant to the instructions of the administrator of the Beame Campaign, bills totaling $12,144.20 were sent to the two locals by two creditors of the Beame Campaign —Scoop Printing Company, Inc. and Behl Printing Co. The Scoop bills stated that they were for various stationery items ordered by the union. The Behl bills bore the notation that they were for printing for political primaries. The Scoop bills are the subjects of counts one through eight. On October 27, 1965, Local 810 paid $2,581.37 to Scoop for the benefit of the Beame Campaign (count one). Between November 29, 1965 and

---

4. We are not relying upon this allegation in count eighteen to supply any allegations in the other counts of the indictment. See note 3 *supra* and accompany-ing text. Such allegation is merely evidence of what was before the grand jury when they indicted.

June 21, 1966, Local 1614 paid $2,581.38 in seven equal installments to Scoop for the benefit of the Beame Campaign (counts two through eight).

Since my brothers Friendly and Hays are of the opinion that the conviction on counts one through eight must be reversed, the majority opinion as to these counts is to be found in the separate opinion of Judge Friendly (Judge Hays concurring). My views on these counts are set forth below and constitute my dissenting opinion.

All the parties conceded and the jury was charged that a political contribution *per se* by a union is not unlawful. The issue is rather whether the contributions were properly authorized and made for the benefit of the union. The unions' constitutions and by-laws were introduced to show that the unions had the power to make political contributions. The minute books revealed that resolutions purporting to ratify past political contributions and to authorize further contributions were passed by the membership of Local 810 on September 16, 1965 and by the membership of Local 1614 on September 24, 1965 and by the executive boards of both locals on September 24, 1965.[5]

On appeal, Silverman contends that there is insufficient evidence to support a conviction under section 501(c) of the Labor-Management Reporting and Disclosure Act of 1959 (the Act). That section makes liable for criminal punishment anyone "who embezzles, steals, or unlawfully and willfully abstracts or converts to his own use, or the use of another, any of the * * * assets of a labor organization of which he is an officer * * *." After reviewing the

reported decisions in prior convictions under this statute, Silverman urges that there is no theory upon which the facts of this case can be said to constitute a violation of section 501(c). An initial issue is whether the conduct revealed in this case is of the type that Congress sought to prevent by imposing criminal sanctions.

The purposes and policies of the Act are revealed in section 2. Congress found from investigations of the labor and management fields that

"there have been a number of instances of breach of trust, corruption, disregard of the rights of individual employees, and other failures to observe high standards of responsibility and ethical conduct * * *." 29 U.S.C. § 401(b).

In section 501 Congress defined "in the broadest terms possible the duty which the new federal law imposes upon a union official." Highway Truck Drivers and Helpers Local 107 v. Cohen, 182 F.Supp. 608, 617 (E.D.Pa.), aff'd per curiam, 284 F.2d 162 (3d Cir. 1960), cert. denied, 365 U.S. 833, 81 S.Ct. 747, 5 L.Ed.2d 744 (1961). Section 501(c) created "a new Federal crime of embezzlement of any funds of a labor organization." Colella v. United States, 360 F.2d 792, 799 (1st Cir.), cert. denied, 385 U.S. 829, 87 S.Ct. 65, 17 L.Ed.2d 65 (1966). The crime is defined with the use of traditional terms and may be committed by several means. It was the plain intention of Congress to hold officers and employees strictly responsible as fiduciaries for the union funds entrusted to them and this intention should not be subverted by the use of indirect methods. United States v.

5. These resolutions paralleled each other in language and were each preceded by a recitation of the "local situation" which led to the conclusion, "Favorable solutions of these and other pressing problems require candidates for local public office who are friendly to our aims and objectives." The resolutions themselves stated:

"Resolved, that this local Union give aid and support to such local candidates in Primary and General Elections who merit our support; that appropriate publicity, manpower and financial assistance be given in furtherance thereof; that any expenditures heretofore made for such purposes are ratified and approved; and that the President is further authorized to make such additional expenditures as he, in his discretion, believes reasonable and necessary."

Harrelson, 223 F.Supp. 869 (E.D.Mich. 1963).

The fiduciary role that labor officials must occupy is defined in section 501(a) to include a duty to hold the union's property solely for the benefit of the union and to expend it only in accordance with its constitution, by-laws and resolutions. Decisions finding violations of the criminal provision of section 501(c) have also emphasized the elements of appropriate union benefit and proper union authorization. Section 501(c) is read as requiring an intent to deprive the union of the use of its funds and *either* a lack of union benefit from the expenditure *or* a lack of proper authorization for the expenditure. In *Harrelson, supra,* the violation of section 501(c) "consisted in the use of union funds for political purposes with knowledge that such use was unauthorized and with the intent to deprive the union of its use of the funds." 223 F.Supp. at 871. The opinion gives no indication as to whether there was an issue as to union benefit from the expenditure, but there can be no doubt that it was unauthorized. In Woxberg v. United States, 329 F.2d 284 (9th Cir. 1964), the court affirmed one conviction because the jury could have concluded the issues of union approval and fraudulent intent adversely to the appellants, *id.* at 293, and reversed certain other convictions since there was no evidence of the required intent, *id.* at 294.

It is clear that when there is no possible union benefit from the use of the union funds made by the official, it makes no difference whether the use was authorized. Thus, in United States v. Dibrizzi, 393 F.2d 642 (2d Cir. 1968), the jury could have found that the expenditures "were personal non-business expenses and in no way incurred in furtherance of the union's business." Our court stated that:

> "Even if appellant may have established that his expenses were, as he claims, authorized and adopted by the union, such does not absolve him of his crimes * * *." 393 F.2d at 645.

Silverman argues that the basis of the *Dibrizzi* decision is that in no circumstances could a labor organization have the power to authorize payments of the personal non-union expenses of its officers. His rationale, stated in broader terms, would be that in every case where there is no union benefit, the authorization is *ultra vires* the union. Analogy is drawn to the Highway Truck Drivers case, *supra,* wherein an expenditure for legal expenses incurred by union officials in defending against criminal charges was enjoined under section 501(b). Such an expenditure was held to be outside the legitimate aims and purposes of the union as expressed in its constitution and as inconsistent with the aims, purposes and spirit of the Act. 182 F.Supp. at 620. If the interpretation of section 501(c) urged by Silverman were adopted, then every violation of that section would always involve *both* a lack of union benefit *and* a lack of authorization. The absence of benefit to the union would be the *sine qua non* of the offense and absence of a lawful authorization would become a concomitant element—present only through logical necessity. I would reject this interpretation of section 501 (c). The purpose of Congress in enacting the Act was to preserve "high standards of responsibility and ethical conduct." 29 U.S.C. § 401(a). This purpose can only be fulfilled if the lack of authorization which indicates that the official's action is in breach of his fiduciary responsibilities is interpreted to include not only purported authorizations which are *ultra vires* but also those which are sham or procured through fraud upon the union membership. Under this broader view of unlawful authorization, a lack of union benefit will not always be accompanied by a lack of authorization. Indeed, cases may present themselves where a union benefit is present and yet the fact that the authorization was a sham or procured through fraud would make section 501(c) applicable.

Silverman states that a charge under § 501(c) is not supported by "a showing

of bad judgment in pursuing union ends even if the pursuit were unauthorized." Applt's Brief at 34. Cited as authority for this statement is a cryptic passage in Colella v. United States, 360 F.2d 792, 804 (1st Cir.), cert. denied, 385 U.S. 829, 87 S.Ct. 65, 17 L.Ed.2d 65 (1966). That case involved a padded expense account as to which the jury was charged that it must find the items to have "not been spent for a union purpose." The defendant claimed that he was prejudiced by the omission of the words, "whether such expenditures were or were not authorized." If the jury found that there was a union benefit and yet no authorization, the defendant would have been acquitted under the instruction as given. Therefore, the court said there was no prejudice in the charge. This could have been for either of two reasons: (1) It is a correct statement of the law that the presence of a benefit takes the act out of the prohibition of the statute whether authorized by the union or not, or (2) The presence of a union benefit does not immunize an act when the act is unauthorized and is done with fraudulent intent, but defendant was not prejudiced since the charge was more favorable than that to which he was entitled. I prefer the latter interpretation of the case.

To hold otherwise would be to encourage the freewheeling exercise of dictatorial power by labor leaders over the membership of their unions. Lawless transactions would occur which were only arguably or through the use of hindsight for the benefit of the union. Enforcement of "high standards of responsibility and ethical conduct" would be curtailed when the unbridled use of union funds can be immunized from the sanction of criminal liabilities by the fortuitous existence of a collateral union benefit. Overzealousness in government super-

vision of the fiduciary role of labor leaders is avoided by the requirement that a criminal intent be demonstrated in addition to the lack of either authorization or union benefit. The existence of a bona fide union benefit would be strong evidence that there was no intent to deprive the union of the use of its funds.

The charge given the jury in this case presented the issues of intent, authorization and benefit fairly and accurately (Tr. 1127–32, 1191). Silverman does not object on appeal that these instructions were in error. His objection is that under no theory were the facts sufficient to support the jury's verdict. In deciding whether, as a matter of law, the evidence presented no question for the jury, we must look at the evidence in a manner most favorable to the prosecution. Woxberg v. United States, *supra*, 329 F.2d at 293; Glasser v. United States, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942).

There can be no question that contributions to local political campaigns do not contravene the purposes of the Act. Supporting local candidates who are more sympathetic to the goals of the labor organization undoubtedly can be beneficial to the union and its membership. Engaging in political activities may be included in the constitution and bylaws of a labor organization as one of the legitimate purposes of the organization. In this case, the constitution and bylaws of both locals authorized political activity in broad terms.[6] Nevertheless, the existence of such power does not indicate that each particular exercise of it will be for the benefit of the membership and receive the bona fide authorization of the labor organization. The contributions which are the subject of counts one through eight were arguably made for the benefit of the union and arguably with its authorization. Yet

6. The constitution of Local 810, for example, provides at section 2.04 of Article II as follows:

"To the extent permitted by law within the limits of the means and finances available to us, this organization shall engage in political activities which tend to foster our welfare. * * * It shall include financial contributions in support of the campaigns of candidates or for or against any political issue."

there was substantial evidence presented to the jury from which it could have concluded that these contributions were either for the private benefit of Silverman or made with only a sham and invalid authorization from the unions.

The way in which the political contributions were solicited, paid and recorded in the books of account permits an inference adverse to the defendant's innocence. Silverman personally made a commitment to Steingut, apparently without any consultation with the union itself, and paid one-third of this commitment on September 13th—three days before the earliest authorizing resolution. The authorizing resolutions themselves were stated in overly broad terms—not stating the individuals to whom the contributions were to be made or the amount of the contribution.[7] The membership of the locals had no idea of the nature of the proposed or already executed expenditures and did not participate in any meaningful way in the authorization of such expenditures. One member of the executive boards of both unions testified that he did not remember the authorizations and had no idea of the amount of money to be contributed. Another member of the board testified that he might have objected to the amount in view of the deficit in Local 1614. Even more damaging is the accounting treatment given the contributions—a treatment which effectively precluded the membership from determining what amounts were spent and to whom the contributions were made. The Scoop bills (charged in the indictment) purported to be for stationery, while the Behl bills (not charged in the indictment) stated they were for printing for political primaries. Silverman approved the bills knowing that they represented political contributions. Yet not only the mislead-

ingly labeled Scoop bills but also the correctly labeled Behl bills were entered in the books of account of both locals as "printing expenses" rather than "contributions." The jury could have concluded that Silverman knowingly participated in this misrepresentation of the nature of the expenditures.[8]

No reliance can be placed upon what the government calls the "peculiar location, *after* the signatures of the resolutions purporting to authorize political contributions." Brief at 33 (emphasis in original). No one drew attention to this alleged evidence or sought an explanation at trial. Upon examination of the exhibits we have found that the attached resolutions were incorporated by reference in the text of the minutes of each local (GX. 3, p. 14, *ll.* 10–12; GX. 5, p. 13, *ll.* 6–8) and that this practice was not unique (GX. 5, p. 7, *ll.* 30–34).

I would hold that the degree of domination and control exercised by Silverman over the labor organization and its personnel is relevant to a determination of whether the authorization was a mere sham and whether the purpose was for a private non-union benefit. I recognize the danger that such evidence may mislead the jury into the fallacy involved in making the forbidden "bad man inference."[9] The degree of control is certainly relevant, as recognized in the charge in this case, to the intent with which the defendant acted (Tr. at 1129). It may well be that the mere demonstration of one-man control of a labor organization would be insufficient evidence, in itself, to support a finding that a resolution was sham or null and void or that it was passed for the private benefit of the union leader. Nevertheless, such evidence, when combined with certain other facts, lends support to the reasonableness of a jury's verdict. Here the testimony as a whole revealed a striking

---

7. See note 5, *supra.*

8. Count fifteen charged that the political contribution charged in count one was falsely reported in the 1965 annual report made by Local 810 to the Secretary of Labor. The disbursement was listed as "Office and Administrative Expense" rather than as "Contributions, Gifts and Grants." The jury verdict of guilty on count fifteen is not attacked on appeal as unsupported by sufficient evidence.

9. See discussion below.

lack of attention to the functioning of the union leadership by the executive committees and the memberships.

In conclusion, I find that a conviction under section 501(c) may be made out by a demonstration of a fraudulent intent to deprive the union of its funds and either a lack of bona fide authorization or an absence of benefit to the labor organization from the expenditure. Therefore, I would hold that the facts presented in this case were sufficient to support the jury's verdict on the charges in counts one through eight.

### Counts Ten Through Thirteen—The "CHRISTMAS GRATUITIES"

On December 7, 1965 and again on December 13, 1966, Silverman received a check from each of these two locals in the amount of $2,000. These four checks are the bases for the charges of violation of section 501(c) contained in counts ten through thirteen. These payments to Silverman were carried on the books of account as steward's committee expenses. The reporting of two of these payments in such a manner in the Labor-Management Reports of 1965 and 1966 led to counts sixteen and seventeen of the indictment. Silverman argues that his acquittal of the charges in counts sixteen and seventeen implies that the jury must have been using some "misguided theory" when it found him guilty on counts ten through thirteen. He also argues that there was insufficient evidence to support the verdict on these counts.

It is not difficult for us to reconcile the acquittal on counts sixteen and seventeen with the guilty verdict on counts ten through thirteen. The jury might well have concluded that Silverman lacked an awareness of the nature of the Labor-Management Report in question which would be required to support a finding that he acted willfully or recklessly as to this item of false reporting. We need go no further in justifying the opposite results reached by the jury on counts involving so few common elements as these.

The primary thrust of Silverman's attack on the sufficiency of the evidence is that it fails to support a finding that the money was expended for a non-union purpose. Reliance is placed on United States v. Lynch, 366 F.2d 829 (3d Cir. 1966) wherein the absence of a union record that a certain initiation fee had been received was found insufficient to support the inference that the fee had not been received by the union. Without any other proof that the union had not received the fee, the Third Circuit held the inference that Lynch had converted the fee to his own use was too tenuous to be drawn. *Lynch* establishes no *per se* rule that an inference of embezzlement may not be drawn from inadequate union records. Rather, it merely applies the familiar principle that all the circumstances must be examined in determining whether the direct proof and permissible inferences support the jury verdict.

It is admitted that Silverman received money that belonged to the union, expended that money and did not file vouchers to show the use to which the money was put. Since what happened to the money after it left the hands of the union was wholly within the knowledge of Silverman and only he could supply the information to fill the gap in the union records created by the absence of vouchers, we feel that the *Lynch* case does not prevent the jury from drawing inferences adverse to Silverman's innocence. Silverman testified that the Christmas gratuities checks were traditionally issued to him and that he commonly used $500 to $800 to reimburse himself for his own advances to various union members and the remainder for distribution to active union members. This explanation might have been rejected by the jury in view of the testimony of Vito Spano, a member of the executive boards of both locals for over 20 years, that past "practice" had been brought to his attention only a few months before the trial.

Turning from the question of whether the Christmas gratuity checks were used

for a non-union purpose to the question of whether the drawing of the checks was authorized, we find that the jury could have concluded that the authorizing resolutions were wholly fabricated. Silverman attempted to establish that an annual practice dating back to 1960 existed whereby "bonuses" were channeled through him to shop stewards and others. It is unclear whether the term "Christmas bonuses" was used as an alternate characterization of the "Christmas gratuities." The jury could have concluded that it was not. The authorizations for "Christmas bonuses" often referred to the officers, staff and clerical help of the union while any reference to "Christmas gratuities" was to expenses incurred by Silverman during the holidays. Therefore, the resolutions which Silverman relies upon to justify the 1966 payments can be understood to relate to wholly different transactions than the ones charged in counts twelve and thirteen. Under such circumstances there was no authorization for the 1966 payments, as admitted by both Spano and Alex Kibuik, a member of the executive board of Local 1614 for eight years, during their testimony as witnesses called by the government.

The minutes of the executive board of each local on December 3, 1965, as received by the government during its investigation, contained statements that Silverman reported that he had paid for organizational work and entertainment and would need money for Christmas gifts. These "reports" conclude with a request for $2,000 as "additional compensation." These minutes were examined by the Federal Bureau of Investigation. An FBI expert gave testimony that the typewriter used to prepare page 21 of the Local 810 minutes and page 19 of the Local 1614 minutes (the pages upon which Silverman's reports and requests are found) was not used in the preparation of the other page of the minutes of the December 3, 1965 meetings or any other page in the minute book of either

local for the entire year. That this discrepancy was evidence of the fact that the authorization for the Christmas gratuities was fabricated is confirmed by the so-called "Friedland report." [10] Jacob Friedland was an attorney retained to examine the records of Local 810 before they were produced in compliance with a grand jury subpoena. His testimony and report tend to indicate that the minutes had been changed in order to supply an absent authorization for a loan of $2,000 to Silverman. In addition, neither Kibuik nor Spano recalled the alleged authorizing resolutions being made at the December 3, 1965 meetings. Since both the loan authorization and the so-called gratuity authorization were in the same paragraph, this evidence would permit the jury to conclude that the 1965 authorization was fabricated.

■ In sum, we find the verdicts of guilty on counts ten through thirteen are supported by the evidence and that the jury could have concluded that the amounts involved were either retained by Silverman or used to maintain his own hegemony over the two locals. The strained interpretation of "Christmas bonuses" in 1966 and outright revision of the 1965 minutes would have allowed the jury to find that the alleged authorization was wholly fabricated. We affirm these convictions.

### Count Fourteen—The "AIR CONDITIONER"

Count fourteen of the indictment charged Silverman with embezzling $1,000 from the unions' Health and Welfare Fund on or about July 18, 1966. In response to a motion for a bill of particulars, Silverman learned that the conversion in count fourteen was the only one of the embezzlement counts (counts one through fourteen) which was accomplished by the receipt of cash. He also learned that the receipt was direct and not constructive as in counts one through eight. Except for a few informal disclosures in open court, further particu-

---

10. The admissibility of this evidence is discussed below.

lars were not revealed until two weeks before trial. Defense counsel then learned that during the renovation job on a building purchased by the welfare fund for use as a joint headquarters for the four labor organizations, an old central air conditioner was purchased by a scrap dealer known as Marshall Katz. Katz had cashed a check for $1,000 and paid the proceeds to some undisclosed person who delivered the proceeds to Silverman.

At the trial the government presented Paul Chlystun, the superintendent of construction, who testified that Silverman had instructed him to sell the air conditioner and that the proceeds of the check had been delivered by him to Silverman on the morning of July 18, 1966. Silverman did not claim surprise at the presentation of this evidence; in fact, he presented seven witnesses in defense whose testimony raised the issues of the true value and ownership of the air conditioner and the credibility of Chlystun based on bias against Silverman and prior convictions for bookmaking. Apparently, the jury believed Chlystun and disbelieved Silverman's denial since they convicted Silverman on this count.

Eight months after the trial Silverman filed a motion for a new trial on the basis of newly discovered evidence. The claim is that at no time prior to the trial could the importance of Silverman's whereabouts on the morning of July 18, 1966 have been anticipated. The newly discovered evidence was claimed to establish an alibi. The claim, supported by affidavits of eight people, is that Silverman was at an all-day negotiating session at the Conver Steel and Wire Company on East 132nd Street in the Bronx. Judge Palmieri denied this motion on the ground that the decision not to present an alibi defense had been a knowing one made for tactical purposes or, alternatively, the failure to inquire into the existence of an alibi defense was a mistake that could not be "raised to the dignity of a reason for a new trial." He also held that the affidavits were not "sufficiently persuasive or solid" to have "probably" led to Silverman's acquittal if presented at the trial.

In United States v. Polisi, 416 F.2d 573, 576–577 (2d Cir. 1969) we stated:

"The generally held essentials for a new trial based on newly discovered evidence are the following: (1) the evidence must have been discovered since the trial; (2) it must be material to the factual issues at the trial, and not merely cumulative nor impeaching the character or credit of a witness; (3) it must be of such a nature that it would probably produce a different verdict in the event of a retrial. United States v. Costello, 255 F.2d 876 (2d Cir.), cert. denied, 357 U.S. 937, 78 S.Ct. 1385, 2 L.Ed.2d 1551 (1958)."

Compare Berry v. State, 10 Ga. 511, 527 (1851).

■■ The test of the materiality of the evidence stated above, "it would *probably* produce a different result," may be likened in certain cases to the test stated in Larrison v. United States, 24 F. 2d 82, 87–88 (7th Cir. 1928), "the jury *might* have reached a different conclusion." The application of this latter test has been said to be limited to cases of "recantation or where it has been proved that false testimony was given at the trial." United States v. Hiss, 107 F. Supp. 128, 136 (S.D.N.Y.1952), aff'd, 201 F.2d 372 (2d Cir.), cert. denied, 345 U.S. 942, 73 S.Ct. 830, 97 L.Ed. 1368 (1953); United States v. Miller, 411 F.2d 825, 830 (2d Cir. 1969); United States v. Costello, *supra,* 255 F.2d at 879. In the case before us there was neither recantation by Chlystun of his testimony nor proof satisfactory to the trial court that his testimony was false. A motion for a new trial is addressed to the discretion of the district judge and our scope of review is accordingly limited. Factual determinations made by the trial court in passing on a motion for a new trial based on newly discovered evidence may not be set aside unless the findings are "wholly unsupported by evidence." United States v. Johnson, 327 U.S. 106, 111–112, 66 S.Ct. 464, 90 L.Ed. 562

(1946). We cannot disturb the trial court's finding of a lack of the persuasiveness and solidity of the affidavits in establishing falsity in Chlystun's testimony.

This is not a case where we need determine whether an exception to the general rule given above may exist where the prosecutor has suppressed evidence. See United States v. Miller, *supra*; United States v. Polisi, *supra*. Silverman .does not claim that evidence was suppressed. He implies that the government was less than candid in supplying particulars on count fourteen, yet he makes no direct attack on the government's position that giving too many details of the transaction would identify its witness and perhaps subject him to unseemly pressure. No claim of surprise was made after Chlystun's identity was revealed at trial. The defense knew that the charge under count fourteen involved a direct embezzlement of cash. It is hard to understand how any conduct by the prosecution could have prevented defense counsel from investigating and presenting a defense of alibi before the end of the trial. Cf. Brown v. United States, 333 F.2d 723 (2d Cir. 1964); United States v. Edwards, 366 F.2d 853, 873 (2d Cir. 1966), cert. denied, Lipka v. United States, 387 U.S. 935, 87 S.Ct. 2061, 18 L.Ed.2d 997 (1967).

Applying the rule stated in *Polisi, supra,* and the limitation on review established in *Johnson, supra,* we find no error in the denial of a new trial.

### Count Eighteen—The "FALSIFICA-TION OF BOOKS"

Count eighteen of the indictment charged generally that Silverman had caused false entries to be made in the books and records of the two locals in violation of 29 U.S.C. § 439(c) (1964). The evidence revealed at least three specific instances of reporting which might have been considered by the jury in reaching its determination—a circumstance which causes the defense to argue that the charge was "open-ended." These instances of alleged false reporting were the accounting treatment given the bills from the Scoop Printing Company and the Behl Printing Company,[11] the accounting treatment given the "Christmas gratuities" payments,[12] and the allegedly fabricated pages in the minute books. Both by the government at trial and by the defense on appeal, emphasis was placed upon the fabrication of the minute books. While not conceding that the jury could not have found Silverman guilty under Count eighteen upon the proof of improper accounting, we feel that the conviction may be affirmed upon the proof of fabricated minute books.

Silverman's attack upon his conviction under Count eighteen is focused upon the testimony of the attorney Jacob Friedland about his report to Local 810 after having examined their records and the admission into evidence of a portion of the text of that report. Friedland's examination of the records of Local 810 was in early 1967 after the local had received a grand jury subpoena *duces tecum* and before the minutes were submitted to the grand jury. When the government learned of the existence of the report made after this examination, it subpoenaed the report. Judge Thomas F. Murphy granted the local's motion to quash the subpoena on the grounds that the report was protected by the attorney-client privilege, despite the government's argument that Friedland was retained to aid in the commission of a crime.

At trial, Friedland was called to the stand and asked if he remembered the closing paragraph of page 21 of the

---

11. The books of account of both unions carried the Scoop and Behl payments under "expenses to creditors" in the cash disbursements journal and "printing expenses" in the general ledger, although an account for "contributions" existed and was correctly utilized on other occasions.

12. The $2,000 checks issued to Silverman were carried on the books as a "committee expense."

minutes of the executive committee of Local 810, which purportedly authorized a $2,000.00 loan and $2,000.00 for Christmas gratuities. When Friedland denied any independent recollection of this paragraph, the government asked that the report, then in the possession of David I. Shivitz, attorney for Local 810, be shown to Friedland. After extended colloquy, Judge Palmieri declined to rule on the claim of privilege until further evidence was adduced.

Later in the trial, James C. Cadigan, a special agent for the Federal Bureau of Investigation, testified that page 21 of the minutes (as well as page 19 of the Local 1614 executive committee minutes) had been prepared by a typewriter not used in the preparation of any other page in the minute book. Members of the executive boards had testified that they had no recollection of the resolutions found on those pages which purported to authorize Christmas gratuities and a $2,000.00 loan to Silverman. When Friedland was recalled as the government's final witness, the claim of privilege was overruled as to that part of the report which related to a description of the minute books as they were when delivered to Friedland. The claim was denied because there was no confidentiality in the communication of the contents of the minutes, which were public records of the union [13] and because the privilege was being used to frustrate the government's attempt to prove that the minute books had been tampered with, perpetrating a fraud upon the court. Thereupon, Friedland claimed his Fifth Amendment privilege. Immunity from prosecution was secured for Friedland under 18 U.S.C. §§ 2514, 2516(1) (b) (Supp. IV, 1965–68) in time for him to be recalled as a rebuttal witness. His testimony was:

"I have no independent recollection of the contents of the minutes of Decem-

ber 3, 1965, but on examination of my report to which you refer to, my memory has been refreshed with respect to these minutes, and basing it entirely on the report it indicates a change in the minutes."

The portion of the report which was referred to by Friedland in his testimony and acknowledged and authenticated by him was photostated and introduced into evidence as court's exhibit 6A. It stated:

"There is a loan to Milton Silverman in December 1965 and there is no approval of this loan by the Executive Board.

"There is a payment of $2,000 to Mr. Silverman in December 1965 for Christmas gifts and this requires an accounting of where the money was spent." [14]

If this report was properly before the jury without violation of the attorney-client privilege, the jury could have concluded that the minutes had been altered after they were returned from Friedland and before they were surrendered to the grand jury investigation. Since the alteration was to supply approval for a loan to Silverman and perhaps authorization for Christmas gratuity payments, the jury could have determined that Silverman was responsible for the alteration.

As we stated in Colton v. United States, 306 F.2d 633, 639 (2d Cir. 1962), cert. denied, 371 U.S. 951, 83 S.Ct. 505, 9 L.Ed.2d 499 (1963):

"[T]he attorney-client privilege protects only those papers prepared by the client for the purpose of confidential communication to the attorney or by the attorney to record confidential communications * * *."

Friedland's report was neither of these. The communication made by the client in delivering the minutes to its attorney was not a confidential communication of the contents of the minutes since those

---

13. 29 U.S.C. §§ 431(c), 436 (1964).

14. When the trial judge indicated that he would introduce the first sentence quot-

ed as a court exhibit, defense counsel requested that the second sentence be added.

minutes are public records. Perhaps confidential communications were made at the same time, e. g., "give me your advice as to how these minutes should be prepared in the future" or "tell me what is wrong with these past minutes," but communications of this type were not revealed or even sought to be revealed. The portion of the report which was revealed was a description of the minutes as they appeared when presented to Friedland. That portion did not record a confidential communication.

The privilege as commonly formulated refers to a confidential communication *from* the client *to* the attorney. 8 Wigmore, Evidence § 2292 (McNaughton rev. ed. 1961); compare Uniform Rule of Evidence 26 ("between lawyer and his client"). Wigmore states that the reason for bringing communications from the attorney to the client within the privilege is to prevent adopted admissions or inferences of the tenor of the client's communication. 8 Wigmore, Evidence § 2320 (McNaughton rev. ed. 1961). The purpose of the privilege, the encouragement of full disclosure to the attorney in procuring legal advice, implies that a communication from an attorney is not privileged unless it has the effect of revealing a confidential communication from the client to the attorney. In discussing the privilege extended to communications from an attorney, Judge Wyzanski has stated:

> "It follows that in so far as these letters to or from independent lawyers were prepared to solicit or give an opinion on law or legal services, such parts of them are privileged as contain, or have opinions based on, information furnished by an officer or employee of the defendant in confidence and without the presence of third persons. * * *
>
> "However, * * * there is no privilege for so much of a lawyer's letter, report or opinion as relates to a fact gleaned from * * * a public document such as a patent, cf. Edison Electric Co. v. United States Electric L[ighting] Co., [44 F. 294 (C.C.S.D. N.Y.1890)]."

United States v. United Shoe Machinery Corp., 89 F.Supp. 357, 359 (D.Mass. 1950).

In view of the position we adopt with respect to the confidentiality of the content of the communication revealed by the attorney's report, we need not determine whether the report was otherwise admissible under the theory that the client's purpose in consulting an attorney was in furtherance of a crime *to be* committed, e. g., United States v. Bob, 106 F.2d 37, 39–40 (2d Cir.), cert. denied 308 U.S. 589, 60 S.Ct. 115, 84 L.Ed. 493 (1939); Clark v. United States, 289 U.S. 1, 15–16, 53 S.Ct. 465, 77 L.Ed. 993 (1933). Nor do we need to make a finding, which the trial court failed to make, as to whether Friedland was the attorney of Local 810 and not of Silverman, therefore leaving Silverman without standing to assert error in the ruling by the trial judge. 8 Wigmore, Evidence § 2321 (McNaughton rev. ed. 1961); McCormick, Evidence § 96 at 196 (1954).

 We hold that the report was properly admitted into evidence and that the evidence was sufficient to sustain the conviction under Count eighteen.

*Fair Trial*

Silverman contends that he did not receive a fair trial. The bases of this contention are "the admission of completely irrelevant evidence," the practice "of allowing evidence of at best peripheral relevance that was prejudicial to defendant, and then foreclosing him from explaining it," and "the prosecutor's efforts to imply wrongdoing when none was proved." Brief at 70–71. Several of the specific events alleged require close scrutiny and are discussed below. Some of the evidence objected to on appeal was introduced by the defendant himself as part of his trial strategy. For example, in explanation of the false itemizations on the Scoop Printing bills, the defense sought to show that corporations wanted their non-deductible politi-

cal contributions converted into deductible business expenses. Now, it claims that the evidence has no rational connection to the crime charged. Some of the evidence was properly admitted for the limited purpose offered. For example, it was proper to reveal that substantial legal fees were received by the law firm of Shivitz, a character witness, to impeach his testimony by showing motive or bias. Some of the allegations of misconduct by the prosecutor are exaggerations made by removing the comment from the context in which it was made. For example, the reference to the ten-year government investigation of James R. Hoffa in the prosecutor's summation was to refute the defense's argument that Silverman was the innocent victim of this concerted investigation.

*Evidence Showing Silverman's Domination and Control*

■ The evidence having perhaps the greatest potential for prejudice was that which revealed that Silverman exercised almost single-handed control of the activities of the two locals. The danger in admitting evidence of this sort is that the jury may infer that the possession of such power is evidence of bad character. If this inference is made, then the jury may be on its way to the forbidden inference that a person whose character, reputation, or specific acts reveal a tendency or disposition to act in a disapproved fashion is likely to have performed the particular acts alleged in the indictment. Even in the case of direct proof of bad character, such as evidence of prior criminal acts, there are exceptions to the general rule of exclusion when the evidence is substantially relevant for some purpose other than to show a probability of guilt based on the inference from his bad character. See McCormick, Evidence § 157 at 327–31 (1954). Here the evidence introduced was not nearly so prejudicial as direct evidence of prior criminal acts or of bad character—areas where rules of exclusion have been distilled from the circumstances of many cases. The rulings of a

trial judge on evidence such as this should be respected on appeal in the absence of a clear abuse of discretion. McCormick, *supra*, § 157 at 333. The exercise of discretion by the trial judge requires a careful balancing of the probative value of the evidence against the possibilities of prejudicing the jury, sidetracking the trial or surprising the defense. McCormick, *supra*, § 152 at 319–20. Here the evidence of domination and control was necessary to negative the anticipated defense contentions that the expenditures in question were authorized and for the benefit of the unions. It was also relevant to the issue of intent. The prejudice depended upon an inference by the jury that such domination and control is evidence of a criminal propensity. We would frown on any comments from a prosecutor which might encourage the jury to be so prejudiced, but we are not convinced that such attempts were made in this case. We feel that no reversible error was committed below in the handling of this evidence.

We have already alluded above in our discussion of the sufficiency of the evidence to the striking lack of attention to the functioning of the union leadership by the executive committees and the memberships. Spano and Kibuik, members of the executive committees, were unable to remember the authorizations for significant expenditures of the unions. Louis Pavlo, the secretary-treasurer and a necessary co-signer of the checks of both locals, customarily signed fifty and a hundred checks in blank and surrendered them to C. William Nass, the bookkeeper for both locals. It was to reveal this lack of attention with its concomitant domination of union affairs by Silverman that the most hotly disputed piece of evidence in this category was admitted—the purchase of $685 worth of cigars with the funds of Local 810.

The initial mention of the cigars came when Spano was on the stand. Defense counsel had sought to reveal authorization of the expenditures for Christmas

gratuities by showing Spano's signature on trustee certificates approving expenditures from month to month. On re-direct, this evidence was refuted by attempting to show that the approval was meaningless since Spano did not know what he was approving. Spano did not know that the general approval he had signed might include an expenditure for cigars. Later evidence established the precise amount spent for these cigars and suggested that the cigars might have been distributed to the union membership. When the defense mentioned the possible prejudicial effect of this evidence, the trial judge correctly recognized that it had a purpose beyond the idea that Silverman was a "cigar-smoking racketeer."

The manner in which the union was operated was also illustrated by the so-called "gag order" issued under the name of Milton Silverman. It was personally served by a "security officer" on twenty-eight officials of the labor organizations involved. It stated:

> "If you are approached by any Federal Investigators do not give them any information. Refer them to our attorney, Mr. Shivitz.

> "Anyone disregarding these orders will be *summarily terminated.*"

(Emphasis in original.) The government, after having confronted Silverman on the stand with this document, made use of it during summation to show his domination and control over the unions. The prosecutor's graphic statement to put the order in context by comparing it to "the words of Samuel Gompers, one of the founders of the American labor movement, or * * * the words of an Adolph Hitler," was correctly recognized by the trial judge as a "flight of eloquence."

Another factor, which could be evaluated only by the jury and the judge, revealing the domination of the unions by Silverman is the attitude of the union men who testified for the government. Their credibility was to be evaluated in the light of the grants of immunity and their common counsel.

*Immunity and Common Counsel*

Silverman argues that his convictions should be reversed because of misconduct of the prosecutor in questioning witnesses as to whether they would have testified without having been granted immunity from prosecution and as to the identity of their lawyer. He asserts that it was the intention of the prosecutor to use the grants of immunity and the use of a common counsel "to imply general union misconduct—that defendant's associates had been guilty of immunizeable wrongdoing—and therefore defendant, who allegedly dominated them, had surely done something wrong." Applt's Brief at 54. Relying upon cases in which the prosecutor has placed a witness on the stand, knowing that he would validly invoke the privilege against incrimination, e. g., United States v. Maloney, 262 F.2d 535 (2d Cir. 1959), Silverman contends that the government has made "a conscious and flagrant attempt to build its case out of inferences arising from * * *" the grants of immunity. Namet v. United States, 373 U.S. 179, 186, 83 S.Ct. 1151, 1154, 10 L.Ed.2d 278 (1963).

We have examined the arguments made during summation by government counsel and have found no deliberate attempt to use the grants of immunity to infer the guilt of Silverman. Each reference to the immunity was to emphasize the reluctance of the witnesses to testify. This reluctance was relevant to the jury's evaluation of the witnesses' credibility.

Neither was there error in permitting the government to bring out the grants of immunity or the common counsel on its direct examination of the witnesses. United States v. Brill, 350 F.2d 171, 174 (2d Cir. 1965). A grant of immunity, to government witnesses, just as the prior criminal record of its witness, United States v. Murray, 297 F.2d 812 (2d Cir. 1962), or a plea of guilty by the

witness with sentencing awaiting the giving of testimony for the government, United States v. Del Purgatorio, 411 F.2d 84, 87 (2d Cir. 1969), or an invocation of the Fifth Amendment before the grand jury with a subsequent promise of no prosecution in return for a promise to testify for the government, United States v. Brill, *supra,* may be brought out on direct examination, provided the jury is cautioned that the testimony is not evidence of the defendant's guilt. As we stated in United States v. Freeman, 302 F.2d 347, 350 (2d Cir. 1962), cert. denied, 375 U.S. 958, 84 S.Ct. 448, 11 L.Ed.2d 316 (1963):

> "There may be circumstances where, on proper request of the defense, the trial judge should limit, or even bar such testimony, or allow it only under cautionary instructions because of the witness' admission of crime implicating the defendant would outweigh the advantages of a full disclosure of the witness' criminal background."

█ There was no objection to the questions concerning the identity of the witness' counsel and the grant of immunity at the time these questions were asked. No objection was made to the instruction that failure to testify except upon a grant of immunity allows the inference that the testimony was given "with reluctance." Nor were there requests at trial for a more explicit instruction that neither the grants of immunity nor the use of a common counsel would support an inference as to the guilt or innocence of the defendant. In the absence of such objections and after having found, in the context of the whole case, that the failure to give more explicit instructions is not plain error within Fed.R.Crim.P. 52(b), we find no reversible error. United States v. Indiviglio, 352 F.2d 276 (2d Cir. 1965), cert. denied, 383 U.S. 907, 86 S.Ct. 887, 15 L.Ed.2d 663 (1966).

## Cross-Examination of Character Witnesses

Silverman presented seven character witnesses. Before cross-examination was begun, the government put defense counsel on notice that questions would be asked concerning the prior arrest record of the defendant. Defense counsel objected on grounds of prejudice because none of the arrests had culminated in convictions. The trial judge ruled that such questions would be proper and added that the defense would be allowed to establish the fact that the defendant had never been convicted. On appeal a broadside attack is launched on the use of this procedure and the prejudicial consequences of it. Specifically, Silverman objects that (1) there was no determination of the prosecutor's good faith made before the questions about prior arrests were propounded to the witness; (2) the character traits involved in the prior arrests were not those established by the good character testimony and the arrests were too remote in time to be relevant; (3) inadequate cautionary instructions were given; and (4) testimony in rebuttal was improperly excluded.

█ In its consideration of the use of prior arrests in the cross-examination of character witnesses, the Supreme Court stated that the trial judge must have broad discretion. Reversal by appellate courts occur "rarely and only on clear showing of prejudicial abuse of discretion." Michelson v. United States, 335 U.S. 469, 480, 69 S.Ct. 213, 221, 93 L.Ed. 168 (1948).

█ This is not a case wherein the trial judge either was affirmatively mistaken in his view of the law as established in *Michelson, supra,* or misconceived the permissible inquiry allowed by that decision. See Roberson v. United States, 237 F.2d 536, 541 (5th Cir. 1956), cert. denied, 356 U.S. 919, 78 S.Ct. 704, 2 L.Ed.2d 715 (1958); Wilcox v. United States, 387 F.2d 60, 64 (5th Cir. 1967). In the absence of a demand for a demonstration out of the hearing of the jury of the good faith of the prosecutor in asking questions about actual events which were likely to arise in community discussion of the defendant's character and reputation, we cannot conclude that the trial judge erroneously failed to sat-

**126**

isfy himself that such requirements were met.

██ The arrests that were brought out on cross-examination were an assault arrest 14 years ago and a forgery arrest 29 years ago. The argument that these were too remote in time and revealed character traits which were dissimilar to those raised in the direct examination should have been raised before the trial judge to aid him in making the initial determination as to the propriety of the questions. As it was, the objection as to prejudice was only on the ground that the arrests had not led to convictions. This objection was properly met by allowing the defendant to establish that the arrests had not resulted in convictions. This fact was established both by the use of some of the character witnesses and by the testimony of the defendant himself. Attempts by defense counsel to present the circumstances of these arrests to reveal that they were wholly baseless were properly rejected as attempts to raise issues which were collateral to the charges before the jury. The problem of the trial-within-a-trial may be avoided by limiting rehabilitation of a character witness impeached by even improperly phrased questions about prior arrests to responses about the outcome of these charges. Shimon v. United States, 122 U.S.App.D.C. 152, 352 F.2d 449 (1965).

The cautionary instruction given at the end of the trial gave full and fair treatment to the problems presented by the use of prior arrests in impeaching a character witness. Silverman's complaint that this was "too late" is untenable in view of the proper presentation of the questions before the jury and the absence of a request for instructions at the time the questions were asked. United States v. Giddins, 273 F.2d 843, 846 (2d Cir.), cert. denied, 362 U.S. 971, 80 S.Ct. 955, 4 L.Ed.2d 900 (1960).

Judgment of conviction and order denying a new trial affirmed, except as to counts one through eight which are reversed in accordance with the accompanying opinion of Judge FRIENDLY.

FRIENDLY, Circuit Judge (with whom HAYS, Circuit Judge, joins):

██ We are unable to agree to the affirmance of the convictions on counts 1–8, relating to the payments to Scoop Printing Company, Inc. Although in this case the only practical effect of our different opinion is to reduce the fine from $16,000 to $8,000, the construction of 29 U.S.C. § 501(c) is an issue that will be with us for a long time.

When Congress in 1959 subjected to criminal sanctions "any person who embezzles, steals, or unlawfully and willfully abstracts or converts to his own use, or the use of another" any of the assets of a labor organization of which he is an officer or employee, it was not inventing new language. The phraseology resembles that used in defining many "larceny-type" offenses in the criminal code. See, e.g., 18 U.S.C. § 641 (public money, property or records), § 645 (court officers), § 654 (officer or employee of United States embezzling or converting money or property of another), § 655 (theft by bank examiner), § 656 (theft, embezzlement, or misapplication by bank officer or employee), § 657 (employees of various lending, credit and insurance institutions), § 658 (property mortgaged or pledged to farm credit agencies), § 659 (interstate or foreign shipments by carrier), § 660 (carrier's funds derived from interstate commerce), § 661 (personal property within maritime and territorial jurisdiction); 15 U.S.C. § 80a–36 (assets of registered investment companies). These statutes have gone beyond the common law offense of larceny and the old statutory crime of embezzlement because "gaps or crevices have separated particular crimes of this general class and guilty men have escaped through the breaches," Morissette v. United States, 342 U.S. 246, 271–272, 72 S.Ct. 240, 254, 96 L.Ed. 288 (1952). But, as was there held, despite minor variations in language the common thread is that the defendant, at some stage of the game, has taken another person's property or caused it to be taken, knowing that the other person

would not have wanted that to be done. See Brown v. Bullock, 294 F.2d 415, 418–420 (2 Cir. 1961). Congress subjected union officers or employees to the same test of criminal liability as government employees, bank officers and the like—not to a lower one. See Colella v. United States, 360 F.2d 792, 798 n.4 (1 Cir.), cert. denied, 385 U.S. 829, 87 S.Ct. 65, 17 L.Ed.2d 65 (1966), and the legislative history there cited.

It is not seriously asserted that by causing the payment of Scoop's printing bills for the Beame mayoralty campaign, Silverman "embezzled" or "stole" the unions' assets in the ancient sense of those terms; the claim is that he unlawfully and willfully converted monies to the use of another. It is easy to understand how a union employee does this when he "unlawfully and willfully" uses union funds in a manner that works to the personal benefit of himself or the payee and does not benefit the union, whether or not the union went through the form of authorization; the "union" presumably would have objected if it had been able to speak freely. Such was this court's holding in United States v. Dibrizzi, 393 F.2d 642, 645 (1968), and the First Circuit's in Colella v. United States, *supra*, 360 F.2d at 804. But, as our brother MOORE correctly recognizes, that is not this case, since the unions' constitutions contemplated financial contributions in support of the campaigns of political candidates. While it is doubtful whether a payment made in a bona fide belief that it was for a

union's benefit and that it had been authorized or would be ratified can ever be swept under 29 U.S.C. § 501(c), we do not need to face that issue here. Even if one should accept *arguendo* that a "conviction under section 501(c) may be made out by a demonstration of a fraudulent intent to deprive the union of its funds and either a lack of bona fide authorization or an absence of benefit to the labor organization from the expenditure," we fail to see how the Government presented evidence that could cause a reasonable juror to be convinced of this beyond a reasonable doubt with respect to counts 1–8.

As already indicated, the Government's case on the issue of lack of benefit failed. But its case with respect to lack of authorization was equally weak. Resolutions appearing in the minutes of both unions authorized Silverman to make such contributions to candidates for local public office (who supported union goals) "as he, in his discretion, believes reasonable and necessary."[1] In the minutes of each local these resolutions were set out on the page after that containing the signatures of the members of the executive board, and the Government's brief used this plus the supposed lack of any reference to the resolutions "in any of the material *before* the signatures," to challenge the validity of the authorizations. The argument would hardly have been made if the Federal Rules of Appellate Procedure had been complied with,[2] for inspection of the ex-

---

1. None of the Scoop bills were paid prior to the passage of the resolution.

2. Noting that the minutes were not reproduced in the book of exhibits furnished by appellant pursuant to FRAP 30(e), we inquired at the argument where they were. It turned out that these and other important exhibits had been retained by the Government rather than being kept by the clerk of the district court and transmitted by him as FRAP 10(a) and 11(a) plainly require. We should no longer tolerate such studied ignoring of these salutary rules despite the long standing disregard of them and their predecessor in the Southern District of New York, es-

pecially in criminal cases. Whatever may have been the justification for that twenty years ago, the development of methods of photographic reproduction generally makes it feasible for a party offering an exhibit to have enough copies for himself and his adversary and to leave the original with the clerk as the rules require. Indeed, the Government found this quite easy after we had demanded the exhibits here. When the bulk of a documentary exhibit makes reproduction impracticable, it should be left with the clerk of the district court, who can make it available to both sides as they may require. See also FRAP 11(b), third sentence.

hibits shows that the resolutions are identified in the body of both sets of minutes by mover and seconder, are described as "attached," and are reported as unanimously passed. Judge MOORE thus rightly disclaims any reliance on this line of attack. However, he accepts another misleading statement by the Government that a union officer testified he "had no recollection of the resolution." What the union officer actually said was that he could not recall whether the pages containing the full text of the resolutions were there when he signed the minutes. Some reference is made to the authorizing resolutions being "overly broad." But we find nothing in the Landrum-Griffin Act about that, and whether they were or not, this is a long way from establishing criminal liability for acting for a proper union purpose in reliance on them. Apart from the extent of control Silverman exercised over union affairs, which the opinion rightly characterizes as "insufficient evidence, in itself, to support a finding that a resolution was sham or null and void," all that is left is the false entry of the Scoop payments on the unions' books. But this was a separate violation, of which Silverman was convicted under Count 15, and although concealment is relevant to show evil motive or guilty knowledge, it cannot make a crime where there was none.

Although this trial seems to have been characterized by a degree of over-kill on the part of the prosecutor, we accept Judge MOORE's able treatment of the other appellate issues raised.