The judgment of the District Court will be affirmed.

**Angelo COLELLA, Defendant, Appellant,**

v.

**UNITED STATES of America,**
**Appellee.**

**No. 6513.**

United States Court of Appeals
First Circuit.

Heard Feb. 9, 1966.

Decided April 21, 1966.

Albert L. Goldman, Boston, Mass., for appellant.

Wallace H. Johnson and Peter R. Richards, Attorneys, Department of Justice, with whom Fred M. Vinson, Jr., Asst. Atty. Gen., was on brief, for appellee.

Before ALDRICH, Chief Judge, and MARIS* and COFFIN, Circuit Judges.

COFFIN, Circuit Judge.

This is an appeal from a judgment of the District Court for the District of Puerto Rico, following jury trial in a criminal action alleging violations of Section 501(c) of the Labor Management Reporting and Disclosure Act of 1959, 29 U.S.C. § 501(c).[1]

The indictment contained six counts, similar except in amounts of money and in the description of the particular manner of commission of the crime alleged. Count One alleged that:

"* * * the defendant herein, while employed by the International Union of Electrical, Radio and Machine Workers (IUE) AFL-CIO, a labor organization within the meaning of the Labor Management Reporting and Disclosure Act of 1959 (29 U.S.C. 402(i) and (j)), embezzled, stole and unlawfully and willfully abstracted and converted to his own use, monies and funds belonging to said labor organization, approximately $174.30, which monies and funds were obtained by the defendant herein while acting as such employee on behalf of the said labor organization, in the following manner:

"The defendant Angelo Colella falsified vouchers to be reimbursed for hotel expenses incurred while allegedly staying at the La Rada Hotel, Santurce, Puerto Rico, during the month of March, 1961, falsely showing expenses to be $159.35 and $194.70, when he well knew that the true expenses incurred were in the amount of $179.-75. He received payments from the aforementioned labor organization in accordance with the referred falsified vouchers."

The other counts similarly alleged other amounts totalling $2,910.67, obtained by falsifying vouchers for hotel expenses and automobile rentals.

Defendant, an experienced labor union organizer, currently President of the Congress of Industrial Organizers, was asked by the then Secretary-Treasurer of IUE, Alvin Hartnett, to go to Puerto Rico in the spring of 1961 to stave off a threat from allegedly communist forces to take over IUE's local unions, to settle a major strike, to resolve a dispute among officers of IUE's largest local, to consider the merits of an internal administrative reorganization, and generally to improve IUE's image in Puerto Rico.

Defendant went to Puerto Rico, arriving in late February 1961, and staying until June. His accomplishments were not inconsiderable. He helped bring about the affiliation with IUE of five locals; participated in two strikes and settlements that were favorable for IUE; helped in two other negotiations; advised on grievances with two other companies; helped resist raids from hostile unions in two other cases; and, in the opinion of one witness, improved the public image of IUE in Puerto Rico.

---

* By designation.

1. Section 501(c) provides:
 "Any person who embezzles, steals, or unlawfully and willfully abstracts or converts to his own use, or the use of another, any of the moneys, funds, securities, property, or other assets of a labor organization of which he is an officer, or by which he is employed, directly or indirectly, shall be fined not more than $10,000 or imprisoned for not more than five years, or both."

During this period, defendant testified that he spent substantial sums in paying for lunches and dinners of organizers, feeding workers on picket lines, paying for medicine for some, paying for meetings and conferences. He had kept no records and was unable to be specific as to amounts. Others corroborated the fact that he frequently paid for food and drinks without attesting to precise amounts. He also covered the expenses of a several weeks' stay of members of his family in Puerto Rico, which, he said, had been authorized by the Secretary-Treasurer, as an inducement to persuade him to stay in Puerto Rico. A rough total of amounts which defendant testified he spent for his own board and lodging, for other union purposes, and for his family, is in excess of $4,000.

He made no effort to submit vouchers for reimbursement based on his actual expenditures but, instead, the government proved and he freely admitted that he inflated or fabricated hotel bills and fabricated car rental bills to serve as a basis for his reimbursement. Defendant testified that he followed this course pursuant to long standing instructions of Hartnett, IUE's Secretary-Treasurer, to recover monies spent for liquor, for payments to picket captains, and for other purposes "which could not be covered by strike relief" by inflating hotel or motel bills. Some ten other witnesses testified to having pursued this practice, with six of them attributing the instructions to do so to Hartnett.

The existence of such instructions was denied by Hartnett. Both the President, James Carey, and the Comptroller denied any knowledge of such a practice. In fact, defendant testified that Carey had later strongly criticized him for falsifying vouchers. There was evidence of an internal fight between Carey forces and Hartnett forces, with Hartnett using his alleged power to approve falsified vouchers as a device to reward his supporters and punish his opponents. Finally, there was evidence that defendant disliked the practice he and others had engaged in and sought to obtain a higher per diem allowance for organizers so that resort to subterfuge would not be necessary.

This summary of a hard fought fourteen day trial is admittedly incomplete and, to the extent that it favors either party, favors defendant. The jury returned verdicts of guilty on each count, imposition of sentence was suspended and the defendant placed on probation for three years. On appeal he urges reversible error at every stage from an arrest and seizure preceding the indictment to the instructions which the district court gave the jury. We have carefully reviewed the record of nearly 700 pages, the numerous exhibits, and the extensive briefs of counsel. We find no reversible error.

I

The first area of alleged error lies in the acquisition and use of evidence leading to the indictment. Defendant argues that there was no probable cause for the complaint and the arrest warrant against him; that the search and seizure incident to his arrest were therefore unlawful; that certain testimony of one Mendez before the grand jury resulted from the search; and that therefore the indictment was invalid.

The complaint contained the following allegations: (1) that defendant was an employee of IUE; (2) that he willfully and unlawfully embezzled and converted monies of IUE; (3) that he did so by falsifying an expense statement at a named hotel; (4) that the charge was based on an FBI investigation; and (5) that a named person, whose address was the named hotel, was a material witness. The warrant duplicated this information, except that it did not allege that IUE was defendant's employer, that there had been an FBI investigation, or that there was a material witness. At 2:03 a. m., on the day following the issuance of the warrant, defendant was arrested at a hotel, the officers announcing that they had a warrant for defendant's arrest, searching him, and taking a writing tablet and envelope lying on an open suitcase which defendant identified as his personal pa-

pers. The officers, after some scrutiny, stated that they were taking these as incidental to the arrest. No other search was made.

 We hold that both the complaint and the warrant were valid. The averments of the complaint alleged the commission of a crime, the means used to commit it, the means used to discover it, and the name of a material witness. This is far more than the meager conclusory averment in Giordenello v. United States, 1958, 357 U.S. 480, 78 S.Ct. 1245, 2 L.Ed.2d 1503, cited by defendant, and even more complete and specific than the averments in Jaben v. United States, 1965, 381 U.S. 214, 85 S.Ct. 1365, 14 L.Ed. 2d 345. The defendant attacks the complaint for its failure to allege directly a fiduciary relationship, criminal intent, or the receipt of money by him pursuant to the false statement. To adopt such arguments would be to indulge in an over-technical analysis of the complaint. Cf. United States v. Ventresca, 1965, 380 U.S. 102, 85 S.Ct. 741, 13 L.Ed.2d 684. What we have said about the complaint is equally applicable to the warrant, which charged both a crime and the means of committing it, in language similar to that of the complaint, omitting only the allegations of employment, and of the nature of the supporting evidence.

There remain the questions relating to the seizure of the writing tablet and envelope and the relation of any information thereby obtained to the proceedings of the grand jury. The writing tablet contained a page of notes of defendant's conversations with one Mendez and one Ugarte, employees of the IUE office in Puerto Rico, which reported them as saying that they had followed Hartnett's instructions (presumably as to falsifying vouchers) through fear of losing their jobs. The envelope contained intra-union correspondence in which the President, acting on an accounting report, called on various members (including defendant) to explain or justify their expense accounts and their replies, together with mimeographed reports of meetings on this investigation and newspaper clippings.

We do not reach the question whether these papers, as argued by the government, were instrumentalities or fruits of a crime, or, as defendant contends, were purely evidentiary. For there is no showing that the fruits of the search were used, directly or indirectly, against defendant. The papers seized were not presented to the trial jury, being merely marked for identification by defendant. The alleged taint relates only to the proceedings of the grand jury and is based on (1) the fact that among the papers seized was one sheet with defendant's notes of his conversation with Mendez; (2) the fact that although Mendez had refused to answer questions of government agents before defendant's arrest and the seizure of his papers, he later testified before the grand jury; and (3) the averment that Mendez' testimony before the grand jury related to each count of the indictment.

 It seems clear that, even if the seizure of defendant's notes relating to Mendez were illegal, there is no evidence that the indictment was thereby tainted. The substance of the seized notes did not relate to defendant but to Hartnett. The only possible contributions they could have made to the government's case were the identification of Mendez, and the fact that he was acquainted with the internal operations of the IUE office in Puerto Rico. But the government already knew this. As an IUE staff man in Puerto Rico, Mendez was a logical point of inquiry. And agents had already sought him out. At that time Mendez refused to answer questions or give a statement. Under the subsequent compulsion of a grand jury subpoena he did testify. The government's preexisting awareness of Mendez, from a source independent of defendant's notes, excludes this case from the proscription of Silverthorne Lumber Co., Inc. v. United States, 1920, 251 U.S. 385, 392, 40 S.Ct. 182, 64 L.Ed. 319. Moreover, the FBI investigation, the identification of a material witness in the complaint, and the essentiality of doc-

umentary evidence such as vouchers to the government's case rule out any inference that substantial, competent evidence from other sources was lacking before the grand jury. Nor is there any such contention. See Costello v. United States, 1956, 350 U.S. 359, 362–363, 76 S.Ct. 406, 100 L.Ed. 397; Coppedge v. United States, 1962, 114 U.S.App.D.C. 79, 311 F.2d 128, cert. denied, 1963, 373 U.S. 946, 83 S.Ct. 1541, 10 L.Ed.2d 701; Anderson v. United States, 8 Cir., 1921, 273 F. 20, cert. denied, 257 U.S. 647, 42 S.Ct. 56, 66 L.Ed. 415.[2]

## II

There having been no violations of defendant's constitutional rights, we now consider the question of the validity of the indictment on its face. Defendant alleges reversible error in the court's refusal to dismiss the indictment for failure to state facts constituting a federal offense. The specific defects alleged are failures to allege criminal intent and fiduciary relationship.

As to intent, defendant contends that the indictment must charge wrongful or felonious intent, and that there is no word or combination of words in the indictment which constitutes a sufficient allegation.

We think it clear that the indictment adequately charges felonious intent. Paraphrased, each count alleges embezzlement, theft, unlawful and willful abstraction, unlawful and willful conversion to defendant's own use, all by means of an expense voucher falsified by defendant who received money therefrom when he "well knew" expenses had, in whole or in part, not been incurred. While defendant asserts in his brief that he "could have performed every specific act in the indictment and be innocent", we can think of no circumstances where this would be so. One could not innocently embezzle or steal. One could not unlaw-

fully and willfully abstract or convert to his own use money belonging to the union, on the basis of a false voucher well knowing it to be false, pocket the proceeds, and still be innocent.

■ Defendant strenuously urges that such a result follows because the word "willfully" does not import knowledge of a wrongful act or a larcenous intent but means merely "voluntary". We cannot agree. While, as we have recognized in Zimberg v. United States, 1 Cir., 1944, 142 F.2d 132, 137, cert. denied, 323 U.S. 712, 65 S.Ct. 38, 89 L.Ed. 573, "willfully" is "a word of many meanings" (citing Spies v. United States, 1943, 317 U.S. 492, 497, 63 S.Ct. 364, 87 L.Ed. 418), we consider applicable to this case the following language from United States v. Illinois Central Railroad Co., 1938, 303 U.S. 239, 242, 58 S.Ct. 533, 535, 82 L.Ed. 773: "In statutes denouncing offenses involving turpitude, 'willfully' is generally used to mean with evil purpose, criminal intent or the like." The indictment in this case sufficiently alleges criminal intent. It meets the requirement of United States v. Carll, 1882, 105 U.S. 611, 26 L.Ed. 1135.

In Doyle v. United States, 8 Cir., 1963, 318 F.2d 419, the same argument as to lack of averment of felonious intent was made against the validity of an indictment arising from the same statute involved in this case. The indictment was less complete than the one we confront, lacking the averments in the second paragraph of each count. Without saying, as we have here, that the indictment sufficiently alleged criminal intent, the court nevertheless held the indictment valid since (318 F.2d at 421) "* * * it adequately and fully informs the appellant of the charge against her * * *" and "* * * is also sufficiently specific in identifying the crime so that a conviction or acquittal thereof could be grounds for

---

**2.** At the trial Mendez was called by defendant as a witness. Defendant was precluded from asking him if he had refused to give a statement to the government before defendant's arrest and if he had subsequently testified before the grand jury. Defendant made an offer of proof and Mendez left the stand. We are therefore not faced with the application of Wong Sun v. United States, 1963, 371 U.S. 471, 491, 83 S.Ct. 407, 9 L.Ed.2d 441.

the defense of double jeopardy * * *." The court took note of the charge to the jury on the issue of intent, which there as here was adequately presented, and observed (318 F.2d at 422) that the judge "* * * treated the element of criminal intent as an essential part of the offense and that the case was tried and submitted to the jury with intent being a prerequisite to conviction."

The authorities cited by defendant to the contrary are not compelling. Morissette v. United States, 1952, 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288, did not concern the validity of an indictment, but rather dealt with the fatal error committed by the trial court in taking away from the jury the issue of intent. The Court, contrary to defendant's impression of the opinion, made it quite clear that the element of evil purpose has often been expressed by courts in their charges (342 U.S. at 252, 72 S.Ct. 240) and by Congress in its statutes (342 U.S. at 264, 72 S.Ct. 240) through the use of the word "willfully". Our own case, Hughes v. United States, 1 Cir., 1964, 338 F.2d 651, rehearing denied, 1965, 340 F.2d 609, while requiring allegation of felonious intent in an indictment, merely held that "unlawfully" falls short of such allegation.

We come now to the failure of the indictment to allege a fiduciary relationship. Defendant asserts that insofar as embezzlement is concerned, the existence of a fiduciary relationship is necessary and must be alleged. He also contends that the bare allegation of an employer-employee relationship falls short of an allegation of a fiduciary relationship. Since such must be alleged in an indictment charging embezzlement, Moore v. United States, 1895, 160 U.S. 268, 16 S. Ct. 294, 40 L.Ed. 422, it follows, argues defendant, that the indictment is defective.

██ This argument pushes too far. Its thrust is a limited one. We are not dealing with an indictment charging simply embezzlement. Section 501(c) establishes "a new Federal crime of embezzlement of any funds of a labor organization." [3] The new crime can be accomplished in one of four ways: embezzling, stealing, unlawfully and willfully abstracting, and unlawfully and willfully converting. But to the extent that terms with a traditional meaning are used, those meanings are still applicable. Embezzlement is one of such terms and carries with it the concept of a breach of fiduciary relationship.[4] Congress spelled out in Section 501(a) its own definition, saying that every "officer, agent, shop steward, and other representative" shall occupy a "position of trust." It further refined this definition by saying, in Section 402(q), that these classes include "elected officials and key administrative personnel, whether elected or appointed (such as business agents, heads of departments or major units, and organizers who exercise independent authority), but does not include salaried nonsupervisory professional staff, stenographic, and service personnel."

---

3. S.Rep. No. 187, 86th Cong., 1st Sess. (1959); H.R.Rep. No. 741, 86th Cong., 1st Sess. (1959), U.S. Code Congressional and Administrative News, p. 2432; Woxberg v. United States, 9 Cir., 1964, 329 F.2d 284, 290, cert. denied, 379 U.S. 823, 85 S.Ct. 45, 13 L.Ed.2d 33 (1964).

4. Woxberg v. United States, supra, at 290: "The terms used in the legislation retain their common law meaning." While this sentence may not strictly apply to embezzlement, a statutory crime, it seems to be clear that the Congress intended to continue to predicate the embezzlement method of committing the new federal crime of embezzlement upon a breach of fiduciary responsibility. The Supplementary Views of Congressmen Elliott, Green, Thompson, Udall, and O'Hara stated: "Although the common law covers the matter, we considered it important to write the fiduciary principle explicitly into Federal labor legislation." H.R.Rep. No. 741, 86th Cong., 1st Sess. (1959). The Minority Views, in the Senate, of Senators Dirksen and Goldwater stated that "This provision [as to embezzlement] gives union members nothing they do not already have." S.Rep. No. 187, 86th Cong., 1st Sess. (1959).

The indictment as drawn in this case might have applied as well to a custodial employee as to defendant, who in fact was an organizer who exercised independent authority. We see no reason why, if the government wishes to preserve for itself the opportunity to prove that the new federal composite crime established by Section 501(c) was committed by the means of traditional embezzlement, it should not set forth in the indictment a sufficient allegation as to fiduciary relationship.

■ But failure to do so, it seems to us, makes very little difference to either party. As far as the government is concerned, we cannot imagine facts constituting embezzlement which would not also, absent a fiduciary relationship, make out unlawful and willful abstraction or conversion. As far as the defendant is concerned, he has been placed in jeopardy with respect to all means of committing the offense by the proper manner of substitution in the indictment of the conjunctive "and" for the statutory disjunctive "or". Crain v. United States, 1896, 162 U.S. 625, 636, 16 S.Ct. 952, 40 L.Ed. 1097; Kitchens v. United States, 10 Cir., 1959, 272 F.2d 757; cert. denied, 1960, 362 U.S. 942, 80 S.Ct. 809, 4 L.Ed.2d 772.[5]

■ The defect goes only to one means of committing the crime charged in the indictment and defined in Section 501(c). In Doyle v. United States, supra, a similar indictment under the same statute was attacked for lack of allegation of fiduciary relationship. The court, after discussing the several means of committing the statutory crime, held 318 F.2d at 423: "It is not an essential element

of the crime charged that the moneys had been held by the appellant in some fiduciary capacity." The defendant has failed to claim or show that the defect as to one means of commission infects the indictment as to all others. While the government failed to profit in its draftsmanship from *Doyle*, the indictment must stand valid.[6]

### III

We now consider numerous errors alleged during the conduct of the trial.

■ Defendant asserts reversible error for the court's refusal to grant his motions to return the papers seized from him. The alleged damage lay not in the use of these papers in the trial, for they were never admitted in evidence. Rather, the prejudice lay, says defendant, in that he and his counsel did not have the benefit of knowledge of the contents for purpose of preparation until the last day and one half of a thirteen day trial. He eventually gained access to the papers by subpoenaing a government agent as his seventeenth witness. He could have acted much earlier. But, more to the point, as government counsel points out, defendant could at any time after indictment have made a motion under Rule 16 of the Federal Rules of Criminal Procedure to inspect and copy items "belonging to the defendant" on a showing that they "may be material to the preparation of his defense". We see no prejudice to defendant resulting from denial of his motions to return property.[7]

Defendant attempts to find error in the rejection by the trial judge of testimony or offers of proof of probable testimony from nine witnesses. We have

---

5. While the indictment in Doyle v. United States, supra, was in the disjunctive, the point does not seem to have been raised.

6. While it is impossible to read *Doyle* as saying that a fiduciary relationship is no longer an essential element of the embezzlement means of committing the new federal crime, we think it more reasonable to read it as saying that such a relationship is not essential to the three other means and that therefore the absence of its allegation in an indictment is not fatal as to these other means. In passing,

we may observe that the defendant was in no way factually prejudiced by the alleged defect in the indictment, it being indisputably clear, on his own admission, that he occupied the fiduciary relationship requisite for the crime of embezzlement.

7. Our reading of the seized file fails to suggest how it would have been of any utility to defendant at trial or before. He was, of course, generally aware of the contents since the papers had been in his possession.

combed the entire record for possible prejudice. We have found none. We reproduce the results of our research in the margin.[8] With one insignificant ex-

8. 

| Witness | Testimony Stricken or Refused | Other Evidence Admitted on Point in Issue |
|---|---|---|
| Ugarte | Defendant's family authorized to come to Puerto Rico. | Stricken only after eight intervening pages of testimony; testifed to independently by Bauer and defendant. |
| Bauer | Defendant's family authorized to come to Puerto Rico. | Later admitted by the court. |
| | Contest for power between Carey and Hartnett. | Testimony of Pugliano and defendant. |
| | Hartnett's authorizing Pierce and Barker to falsify vouchers. | Testimony of Pierce. |
| Pierce | Additional evidence of practice of falsifying vouchers. | Pierce had testified that most of 18 organizers he had named knew of false vouchers and many used them. In addition there was testimony of 9 other witnesses (Ugarte, Bauer, Adams, Barker, Pugliano, Copeland, McCue, Campbell, Otero). |
| Carey | Conversation with defendant in December 1961. | Defendant's testimony to same effect. |
| | Practice of falsification before June 1961. | Ten other witnesses (see comment after Pierce). |
| | Hartnett's instructions to organizers. | Testimony of defendant and 6 other organizers. |
| | Discussion with defendant in April 1961. | No offer of proof as to content, but the judge summarized the probable substance favorably to defendant. |
| Pugliano | Talks with defendant about changing system of falsifying vouchers. (Testimony limited.) | Basic point was made that defendant felt change needed and that he was seeking adequate per diem. |
| Copeland | Conversation with Hartnett on Pugliano's bill. | Testimony of Pugliano. |
| Campbell | Hartnett's authorization to take his family on a job. | All admitted. |
| Otero | Defendant's expenditures at a convention celebration. | No other evidence. |
| Hartnett | Defendant's proposal to increase per diem in order to avoid falsification. | Testimony of Pugliano. |

ception, each bit of stricken or refused testimony has been amply duplicated elsewhere in the record. There is no question of law here. The two principal areas where defendant claims to have been denied sufficient leeway in his proof concern evidence as to prior authority and widespread practice indicating lack of criminal intent. Such proof, whether or not it should have been admitted, was admitted in abundance. The liberal attitude toward such evidence urged in United States v. Matot, 2 Cir., 1944, 146 F.2d 197, 198–199, has been amply observed. The other major point urged was that defendant himself sought to bring about a change in the system. Whether or not this point was relevant, it was forcefully though briefly made by witness Pugliano.

■ Defendant asserts that the court made comments on two occasions in the presence of the jury which prejudiced him. The first was a statement that proof of a practice of falsifying vouchers would require a board resolution or written directive of the head of the union. We see little substance in this. The fact is that the judge allowed some ten witnesses to testify as to their knowledge of and participation in this practice, and his charge, as we shall note, allowed the jury to exonerate defendant if it found that the funds had been spent for union purposes. If error was committed, it was in ignoring 29 U.S.C. § 501(a) which prohibits exculpatory resolutions purporting to relieve violations of the statute. If error, it favored defendant.

■ The second allegedly prejudicial comment involves a misreading of a letter by the judge in which, by confusing defendant with an employee of the San Juan office, he inadvertently supported a government witness rather than defendant on a minor point. Such an error in the course of a fourteen day trial involving 27 witnesses did not prejudice defendant. The court was careful to admonish the jury to rely on its own impressions of the evidence.

■ Defendant, at the outset of trial and at the conclusion of the government's case, made a motion that the government be required to elect the offense it would seek to prove. This motion proceeded on the erroneous assumption that several crimes were involved. We have already stated our opinion based on Senate and House Reports, that one new statutory crime was charged, the commission of which could be accomplished by various means. There was no reason for the government to be forced to elect. See Woxberg v. United States, supra, 329 F.2d at 290; cf. United States v. Harmon, 6 Cir., 1964, 339 F.2d 354, 357–358, cert. denied, 1965, 380 U.S. 944, 85 S.Ct. 1025, 13 L.Ed.2d 963.

■ At the conclusion of the government's case and again at the conclusion of all the testimony, defendant moved for a judgment of acquittal. As to the former it is sufficient to say that a motion so made, followed by testimony for the defense, constitutes an abandonment of that motion. Benchwick v. United States, 9 Cir., 1961, 297 F.2d 330; Gaunt v. United States, 1 Cir., 1950, 184 F.2d 284, cert. denied, 1951, 340 U.S. 917, 71 S.Ct. 350, 95 L.Ed. 662.

■ As to the latter motion, made at the conclusion of all the evidence, defendant asserts that there was insufficient evidence to justify a finding by the jury of criminal intent and conversion to defendant's use. Our standard of review is that of determining whether the evidence viewed most favorably to the government and all reasonable inferences therefrom support the jury's verdict. United States v. Quagliato, 7 Cir., 1965, 343 F.2d 533, cert. denied, 381 U.S. 938, 85 S.Ct. 1771, 14 L.Ed.2d 702; Genstil v. United States, 1 Cir., 1964, 326 F.2d 243, cert. denied, 377 U.S. 916, 84 S.Ct. 1179, 12 L.Ed.2d 185.

■ Using this standard, we cannot say the jury was irrational in its finding of guilt. The knowledge of the falsity of expense vouchers was admitted. Despite the parade of defendant's witnesses attesting to the practice of falsity, the jury had heard the President, Secretary-Treasurer, and Comptroller of the union testify to their ignorance of such a prac-

tice and the lack of authority. While defendant and a number of other witnesses testified to defendant's having spent money liberally for lunches, drinks, prescriptions, travel, and other union purposes, the jury could have disbelieved all. Or, believing much of this testimony, it could have believed there was a balance unaccounted for and willfully and wrongly converted to defendant's own use. The jury might well have considered that witnesses had testified to a practice of falsity relating chiefly to liquor expense and have felt there was no good reason why defendant failed to obtain and forward receipts for food, travel, and other respectable items making up the largest part of his expenditures. It might have believed the union Secretary-Treasurer that defendant had no authority to bring his family to Puerto Rico. It might have drawn adverse conclusions from the destruction of minutes of a union meeting devoted to charges of falsity, the deposit of some monies in defendant's personal bank account, or even an attempt in defendant's presence to change the testimony of witness Ugarte.

The district court properly allowed the jury to make its own assessment of the evidence.

Finally, defendant attacks the instructions to the jury in several respects. The major alleged error was an instruction " * * * as a matter of law that the defendant Colella was * * * in a position of trust as to money he received as expenses from [IUE]. There-

fore, you are instructed as a matter of law that a fiduciary relationship existed. * * * "

We agree that this instruction was error. We do so, not on the state of the evidence (which, even from defendant himself, amply justified the conclusion that he was an organizer exercising "independent authority"), but as the natural consequence of our holding that a fiduciary relationship was not alleged in the indictment. This, however, does not vitiate the validity of the jury's verdict, the charge being accurate in other respects. For every element, other than fiduciary relationship, is also included in either or both unlawful and willful abstraction and unlawful and willful conversion.

A second allegation of error was that the court did not define the elements of each offense charged. As we have said before, there is one statutory offense, with several means of commission. The court adequately defined conversion in instructing "to convert to his own use * * * means intent to apply or appropriate or use for the benefit or profit of the person or persons unlawfully doing the act." It gave no equivalent definitions for abstracting and stealing. No objection or request was made on these points. We see no prejudice to defendant's rights. In United States v. Northway, 1887, 120 U.S. 327, 334–335, 7 S.Ct. 580, 584, 30 L.Ed. 664, the Court referred to "abstract" as a word "of simple, popular meaning, without ambiguity." If this is so, "stole" is crystal clear.[9]

---

9. Defendant cites Williamson v. United States, 5 Cir., 1964, 332 F.2d 123 as support for the alleged inadequacy of the instructions on this point. In that case the court found plain error in a charge relating to the testimony of an accomplice. The court went on to criticize the "summary" nature of the charge defining the elements of the crime. While the offenses proscribed by the statute (18 U.S.C. § 656) included embezzle-

ment, abstraction, purloining, and willful misapplication of bank funds, the judge confined himself to misapplication, defining this by using the word "conversion" which he left undefined. He did not instruct on what was required to establish any element beyond a reasonable doubt. There was no attempt to define "willful" or "intention." The charge in the case at bar, lengthy and detailed, made after ample consideration of re-

The court's charge, as to the spending of money for union purposes, objected to by defendant, was as follows: "As to each count of the indictment, in order to warrant the defendant's conviction, the evidence must convince you beyond a reasonable doubt that the defendant submitted his requests for payment with the criminal intent to obtain money which had not been spent for a union purpose and did thereafter use that money for a non-union purpose." Defendant claims that he was prejudiced by the omission of the words, "whether such expenditures were or were not authorized". We see little difference between the shorter and the longer version. In either case if the jury felt that the defendant had spent for a union purpose, albeit unauthorized, they were to find him not guilty. There is no error in this part of the charge.

The final averment of error is that instead of charging, as requested, that false requests for reimbursement were not commissions of crime, the court said that such a request was not "in itself" a commission of crime. While the innuendo added by the court lessened the strength of the charge defendant sought, we find this instruction a fair one.

Defendant's conviction undoubtedly seems to him unjust in our expense-account society. The finding of guilt and the imposition of a penalty in this case stem from two facts: Congress passed a criminal statute and the jury did not accept defendant's proof.

Affirmed.

quests, adequately treated both the issue of reasonable doubt and that of criminal intent.

One other point in *Williamson* deserves comment. The court asked how, under the charge, one could ascertain whether the jury found defendant guilty of misapplication, of embezzlement, of abstracting, or of purloining. Since the same question was asked of us by defendant in oral argument, we state that the crime for which defendant was convicted was the new federal statutory crime as defined in 18 U.S.C. § 501(c). Apparently in *Williamson* the court felt that the statute was a recodification which embraced several separate crimes. 332 F.2d 123, 133 n. 15.