UNITED STATES of America

v.

Raymond J. SILVA.

Cr. No. 79–0057.

United States District Court,
D. Rhode Island.

June 13, 1980.

Edwin Gale, U. S. Dept. of Justice, Providence, R.I., for plaintiff.

Lincoln Almond, Providence, R.I., for defendant.

## OPINION AND ORDER

PETTINE, Chief Judge.

The indictment on which this defendant was tried charges him in seven counts with violating the Taft-Hartley Act, 29 U.S.C. § 186(b)(1) and in ten counts with embezzlement of union funds while serving as president of Local Unions 1329 and 1996, International Longshoremen's Association, 29 U.S.C. § 501(c).

*FACTS*

During the years in question, most of the loading and offloading of ships in the Port of Providence was done by members of the Rhode Island Shipping Association (Association); it is a group of five stevedoring companies that have a collective bargaining agreement with Local 1329. The stevedoring companies, as employers engaged by shippers to load or offload their vessels, hire union longshoremen members of Local 1329 to do this work. The collective bargaining agreement between the union and the Shipping Association establishes, among other things, as is required by 29 U.S.C. § 186, trust funds for health and welfare, and pension and vacation benefits which accrue by virtue of their contract and the withholding of union dues. The benefit payments are administered and the trust funds are managed · by trustees, the defendant being the trustee for Local 1329. In addition to the stevedoring companies in the Rhode Island Shipping Association, there are other nonmember companies which do not have any collective bargaining agreement with Local 1329.

The defendant represented the longshoremen in the Port of Providence and was elected president of Local 1329 in 1975; a position he still holds. He was the moving force in organizing and having chartered Local 1996; though not elected to any office, he has been its principal spokesman and officer de facto since its inception in 1975. Local 1996 was organized so that members of Local 1329 who joined Local 1996 could be hired as line handlers, a job not authorized under the charter held by Local 1329. There is no collective bargaining agreement between the Association and Local 1996.

This case concerns activities of the defendant with two stevedoring companies, namely Mohawk Trucking and Salvage, Inc. (Mohawk) and Promet Marine Services Corporation (Promet), that are not members of the Association.

In 1977, Diamond Salt Company, an importer of salt from various foreign ports, engaged Mohawk to stevedore ·two of its vessels. In turn, Mohawk entered into an oral agreement with the defendant whereby Local 1329 was to provide for longshoremen to offload the ships in exchange for prevailing Port of Providence wages and benefits. It is clear that no trust agreements were drawn up relative to the handling of health and welfare, pensions and vacation benefits; nor did Mohawk obtain written authorization to withhold dues from the longshoremen.

Pursuant to the agreement with Local 1329, the two ships were unloaded by longshoremen provided by the defendant. A timekeeper and checker marked off all pertinent money matters credited to each worker, such as ·hours, health and welfare benefits, and union dues. Mohawk issued separate checks in each category for which money was due: paychecks to the men who performed the work; dues to Local 1329 which were deposited into the union's account in the normal course of business; and the benefit monies, which were forwarded to the Association for deposit in its appropriate trust fund. This last check was returned by the Association to Mohawk because Mohawk was not a member. After the two ships were serviced, Mohawk discontinued further stevedoring activities.

Mr. Silva then met with a Mr. David Cohen, President of Promet, who had obtained the stevedoring business for certain ships coming into the Port of Providence for the 1978 shipping season. Mr. Cohen was aware of Mohawk's experience with the Association and he advised the

defendant that Promet planned to become a member. Promet then entered into an oral agreement with the defendant to offload the incoming ships, but no written trusts were executed relative to pensions, vacation/holiday, and welfare benefits; nor was any written authorization obtained from individual longshoremen for the withholding of union dues.

Under the contract with Promet approximately six ships were serviced. The defendant contends that when he negotiated with Promet it was understood that the contract was with Local 1996 and not 1329. Because Local 1329 had a collective bargaining agreement with the Association, he feared the Association might retaliate against Local 1329 if it again entered into a contract with a non-member stevedoring company; since Local 1996 had no such collective bargaining agreement with the Association, he decided to use it in order to secure the loading and offloading of these ships that were coming into the Port of Providence, for otherwise others might take over the jobs and thus deprive his men of this work.

The ships came in as scheduled and were unloaded; all the necessary and proper deductions were made. However, the checks were retained by Promet. The defendant had a number of conferences with Mr. Cohen concerning the welfare and pension monies and though Mr. Cohen initially stated Promet would create a trust, it was not done; there came a point when Mr. Silva demanded of Promet and Mohawk that he be given the checks totaling approximately $30,000. The first series of checks issued by Promet and given to the defendant were payable to Local 1996; these were deposited in a bank in the name of Local 1996. Some of the other checks were made out to Local 1329; the defendant claims he told Cohen it was a mistake, whereupon the payee was readily changed from Local 1329 to Local 1996. The defendant contends that it was always understood with Promet that Local 1996 was being used and that at no time did he order the payee on their checks to be changed from Local 1329 to Local 1996. He states, and the Court accepts as a fact, that

when Promet handed him checks payable to Local 1329, it came as a surprise; that he told Cohen he evidently made a mistake, whereupon they changed the payee to Local 1996, saying, in essence, it was the fault of the bookkeeper. In all, Promet issued approximately twenty checks representing dues, check-offs, and vacation/holiday, pension and health and welfare contributions. Included in these checks are those covered by the various counts in the indictment. The checks received from Promet and Mohawk were co-mingled in two accounts in the Industrial National Bank in the name of Local 1996.

The evidence further established that not all the members of Local 1329 were members of Local 1996, nor did all of the members of these two Locals know that the monies were deposited in the Industrial National Bank. Though it is clear Mr. Silva never formally announced nor made it a matter of record in any of the Local 1996 Union minutes precisely what he did with the checks he received or even that he received them, he contends it was a matter of common knowledge among the union members; that it was well known that the Association had refused the Mohawk checks and that if they were going to "work this thing out" they "were going to be working under the jurisdiction of Local 1996 because of the fact that the shipping association was definitely on our back for work for a non-member."

The defendant further explained that he did not open separate accounts, i. e., one for the Mohawk money and another for the Promet money because the Association had refused the Mohawk money in spite of his protestations.

There was further evidence that for a number of years prior to the granting of the charter to Local 1996 the defendant was required to do substantial traveling to organize this Local and secure the charter. He personally advanced these costs but from and after the time the Local 1996 funds were established, he expended the co-mingled money for his activities on be-

half of Local 1996 and Local 1996–1 * and also borrowed from this fund to purchase a home for himself. The government contends that these expenditures from the comingled fund were unauthorized and were in fact used by the defendant for his personal benefit. It is these expenditures that premise counts VIII–XIX.

CONCLUSIONS OF LAW

The first seven counts of the indictment charge the defendant with violating 29 U.S.C. § 186(b)(1) which reads:

(b)(1) It shall be unlawful for any person to request, demand, receive, or accept, or agree to receive or accept, any payment, loan or delivery of any money or other thing of value prohibited by subsection (a) of this section.

Subsection (a) reads:

(a) It shall be unlawful for any employer or association of employers or any person who acts as a labor relations expert, adviser, or consultant to an employer or who acts in the interest of an employer to pay, lend, or deliver, or agree to pay, lend, or deliver, any money or other thing of value—

(1) to any representative of any of his employees who are employed in an industry affecting commerce; or

(2) to any labor organization, or any officer or employee thereof, which represents, seeks to represent, or would admit to membership, any of the employees of such employer who are employed in an industry affecting commerce; or

(3) to any employee or group or committee of employees of such employer employed in an industry affecting commerce in excess of their normal compensation for the purpose of causing such employee or group or committee directly or indirectly to influence any other employees in the exercise of the right to organize and bargain collectively through representatives of their own choosing; or

(4) to any officer or employee of a labor organization engaged in an industry affecting commerce with intent to influ-

ence him in respect to any of his actions, decisions, or duties as a representative of employees or as such officer or employee of such labor organization.

Subsection (c) provides:

(c) The provisions of this section shall not be applicable (1) in respect to any money or other thing of value payable by an employer to any of his employees whose established duties include acting openly for such employer in matters of labor relations or personnel administration or to any representative of his employees, or to any officer or employee of a labor organization, who is also an employee or former employee of such employer, as compensation for, or by reason of, his service as an employee of such employer; (2) with respect to the payment or delivery of any money or other thing of value in satisfaction of a judgment of any court or a decision or award of an arbitrator or impartial chairman or in compromise, adjustment, settlement, or release of any claim, complaint, grievance, or dispute in the absence of fraud or duress; (3) with respect to the sale or purchase of an article or commodity at the prevailing market price in the regular course of business; (4) with respect to money deducted from the wages of employees in payment of membership dues in a labor organization: *Provided, That the employer has received from each employee, on whose account such deductions are made, a written assignment which shall not be irrevocable for a period of more than one year, or beyond the termination date of the applicable collective agreement, whichever occurs sooner;* (5) with respect to money or other thing of value paid to a trust fund established by such representative, for the sole and exclusive benefit of the employees of such employer, and their families and dependents (or of such employees, families, and dependents jointly with the employees of other employers making similar payments, and their families and dependents): Provided, That (A)

---

* Local 1996–1 was organized to handle imported automobiles after they had been unloaded from the ships; because of contract provisions, this work could not be done by Local 1329.

*such payments are held in trust for the purpose of paying, either from principal or income or both, for the benefit of employees, their families and dependents, for medical or hospital care, pensions on retirement or death of employees, compensation for injuries or illness resulting from occupational activity or insurance to provide any of the foregoing, or unemployment benefits or life insurance, disability and sickness insurance, or accident insurance;* (B) *the detailed basis on which such payments are to be made is specified in a written agreement with the employer, and employees and employers are equally represented in the administration of such fund, together with such neutral persons as the representatives of the employers and the representatives of employees may agree upon* . . . ; (6) *with respect to money or other things of value paid by any employer to a trust fund established by such representative for the purpose of pooled vacation, holiday, severance or similar benefits* . . . .

From the foregoing it follows that the elements of the offense for the first seven counts are:

(1) Mohawk and Promet were employers involved in an industry affecting commerce. (This is required by 29 U.S.C. § 142(1), (3) which need not be quoted. There is no dispute as to this element.)

(2) the defendant was a representative of the Mohawk and Promet employees;

(3) the defendant requested, received, demanded or accepted money falling within the cited Code with knowledge that he was requesting, receiving, demanding, or accepting money from an employer or an individual acting on behalf of the employer of the employees;

(4) and that the defendant acted knowingly and willfully as required by Section 186(d) which reads:

(d) Any person who willfully violates any of the provisions of this section shall, upon conviction thereof, be guilty of a misdemeanor and be subject to a fine of not more than $10,000 or to imprisonment for not more than one year, or both.

The government argues that none of the exceptions in § 186(c) apply to this case because the subject monies were not

a) dues that were checked off under valid written authorizations [§ 186(c)(4)];

b) payments to a jointly administered welfare or pension trust established by written agreement [§ 186(c)(5)];

c) payments to a vacation trust fund established in writing and jointly administered by employer and employee trustees [§ 186(c)(6)].

And since these requirements are lacking, payments to any fund to a "representative of employees" is illegal. *Local No. 2 v. Paramount Plastering, Inc.,* 310 F.2d 179, 182, 185–86 (9th Cir. 1962), *cert. denied,* 372 U.S. 944, 83 S.Ct. 935, 9 L.Ed.2d 969; *Mechanical Contractors Ass'n v. Local Union 420,* 265 F.2d 607 (3d Cir. 1959).

The defendant professes his innocence upon the ground that this case falls within the holding of *Arroyo v. United States,* 359 U.S. 419, 79 S.Ct. 864, 3 L.Ed.2d 915 (1959) in that the welfare fund, even if received by the defendant with the intent to misappropriate, was not a violation of Section 186(b).

The terse facts in *Arroyo* are brief enough to quote in their entirety:

The facts are substantially undisputed. In 1953 the petitioner was president of a union which represented the employees of two affiliated corporations. In that capacity he negotiated a collective bargaining agreement with the employers. This agreement provided for the establishment of a welfare fund, which, it is unquestioned, met the requisite criteria of § 302(c)(5) of the Act. It was agreed that the petitioner would be the union representative on the joint committee which was to administer the fund. After the agreement was signed, the petitioner told the employers' representative that there was to be a union meeting that evening, and that he wanted to exhibit the welfare fund checks to the union members. Accordingly, the petitioner was given two checks for $7,500. Attached vouchers

identified the checks as the employers' contributions to the welfare fund.

Instead of subsequently depositing the checks in the existing welfare fund bank account, however, the petitioner used them to open an account in the name of the fund in another bank. A few days thereafter, he gave the bank a purported resolution from the union's board of directors authorizing withdrawals from this account upon his signature alone. As soon as the employers learned what had happened, they attempted to secure performance of the agreement for joint administration of the fund. Over a period of several months, however, the petitioner used the money for his own personal purposes and, after transferring the funds to another account, for non-welfare union purposes as well.

*Id.* at 421–22, 79 S.Ct. at 866.

The Court held, after stating that the evidence might support an inference of embezzlement, there was no violation of § 302(b) of the Act. (The original Taft-Hartley Act was enacted as Section 302 of the Labor-Management Relations Act of 1947. The sections pertinent to this case read as in 29 U.S.C. § 186.) The Court stated at pages 423–425, 79 S.Ct. at page 867

Section 302(b) is a reciprocal of § 302(a), applicable to employers, which provides that "(a) It shall be unlawful for any employer to pay or deliver, or to agree to pay or deliver, any money or other thing of value to any representative of any of his employees who are employed in an industry affecting commerce." The good faith of the employers in delivering the two checks to the petitioner—their intent that the money go to the welfare fund created by the collective bargaining agreement—was not questioned throughout the trial and is not questioned here. The sole purpose of the delivery of the checks, therefore, was to make a lawful payment. What the petitioner received were checks "paid to a trust fund." The transaction, therefore, was within the precise language of § 302(c), and thus was not a violation of § 302(b).

This is not to say that the statute requires mutuality of guilt for the conviction of either the employer or the representative of employees. An employer might be guilty under subsection (a) if he paid money to a representative of employees even though the latter had no intention of accepting. *Cf. Lunsford v. United States*, 10 Cir., 200 F.2d 237; *Schneider v. United States*, 9 Cir., 192 F.2d 498. A representative might be guilty if he coerced payments from an innocent and unwilling employer. *Cf. United States v. Waldin*, D.C., 149 F.Supp. 912, affirmed, 3 Cir., 253 F.2d 551. Both would be guilty if the payment were ostensibly made for one of the lawful purposes specified in § 302(c) if both knew that such a purpose was merely a sham.

The present case, however, is not an analogue to any of those situations. The checks were drawn by the employers and delivered to the petitioner as payment to a union welfare fund. Their receipt by him, therefore, was not a violation of the federal statute, whether his intent to misappropriate existed at the time of receipt or was formed later.

From this the defendant reasons there is no evidence that either Mohawk or Promet attempted to bribe him or that he extorted them. To the contrary, the defendant emphasizes that the employers received no advantage and from the beginning wanted and attempted to have the money go to the trust funds of Local 1329 in keeping with the Collective Bargaining Agreement between Local 1329 and the Association; that the Association unilaterally refused the Mohawk check—Promet knew this. From this argument the implication is that it left them no alternative and so it cannot be inferred they acted unlawfully or willfully as required by Section 186(b). Further, the defendant argues there can be no "finding that the payments to Local 1996 and 1329 were a show to funnel corrupt payments directly to the defendant" since Local 1996 was established for a legitimate purpose;

that even if the Court found a criminal violation, it must also find the payments to the Union were illegal which it cannot do because there is no question the checks were intended as legitimate payments for the benefit of the longshoremen. And finally, the defendant cites *United Marine Division, I.L.A. Local 333 v. Essex Transportation Co.,* 216 F.2d 410 (3d Cir. 1954); *Denver Metro Ass'n v. Journeymen Plumbers,* 586 F.2d 1367 (10th Cir. 1978) for the proposition that the defendant intended to make legitimate payments for the longshoremen; Mohawk and Promet had adopted the collective bargaining agreement between the Association and the Union and therefore could lawfully make payments to the trust fund which the Association prevented them from doing.

*Arroyo* is not apposite; the vital distinguishing fact existing in *Arroyo* but absent in this case is that in *Arroyo* a collective bargaining agreement establishing a trust fund with all the requisite criteria was, indeed, negotiated and executed; the checks were issued to such trust fund.

The defendant's other arguments are not persuasive and I must conclude he is guilty of Counts I through VII.

This is an unfortunate finding because the Court is aware of the defendant's motivation that generated the series of events leading to this indictment. Given the limited education of many of the longshoremen and their jealous concern for safeguarding the force and effectiveness of the union, it is quite understandable why the administrative aspects of the organization were held in a very secondary position. The unions involved in this case were comprised of the men who actually handled the boats. To this Court, it was rather obvious that they expected their leader to take advantage of his position, bend the rules, scream, and get more jobs. However, this is of no avail; the violations are clear-cut and beyond doubt; Mohawk and Promet are indisputably employers involved in an industry affecting commerce; the defendant represented employees of Mohawk and Promet; he knowingly received the Mohawk and Promet checks as the union representative of the employee longshoremen [29 U.S.C. § 186(a)]; the monies received were welfare and vacation payments absent the required written agreement as set forth in 29 U.S.C. § 186(c); the dues were not checked off under a valid written authorization [29 U.S.C. § 186(c)(4)]; and, finally, he willfully violated these various provisions, [29 U.S.C. § 186(d)] as discussed *infra.*

The legislative history of the Act tells us why conduct such as that in this case must be prohibited.

> [t]hose members of the Congress who supported the amendment were concerned with corruption of collective bargaining through bribery of employee representatives by employers, with extortion by employee representatives, and *with the possible abuse by union officers of the power which they might achieve if welfare funds were left to their sole control.* (emphasis added, footnotes omitted).

*Arroyo v. United States,* 359 U.S. 419, 425, 79 S.Ct. 864, 868, 3 L.Ed.2d 915 (1959).

There is no question the defendant was not only the one person "authorized by the employees," *i. e.,* their "representative, to act for them in dealings with their employers," *United States v. Ryan,* 350 U.S. 299, 302, 76 S.Ct. 400, 403, 100 L.Ed. 335 (1956), but their protagonist as well; in this role they did not question him—he controlled the funds; the very loan for his house, made without documentation or security, is proof enough of this fact.

*United States v. Ryan, supra,* holds that § 186 is "*malum prohibitum,* which outlaws *all* payments, [other than those set forth in certain stated exceptions], between employer and representatives of his employees . . . ." The courts have given meaning to the congressional intent by requiring a strict application of the statute. These courts hold that the only diversion of the funds legal under the statute are those payments excepted in § 186(c). *Moglia v. Geoghegan,* 403 F.2d 110 (2nd Cir. 1968); *Arroyo v. United States, supra; United States v. Ryan, supra; United States v.*

*Weber*, 437 F.2d 327 (3rd Cir. 1970). And in *United States v. Ricciardi*, 357 F.2d 91 (2nd Cir. 1966), and *United States v. Keegan*, 331 F.2d 257 (7th Cir. 1964), we find the following language which this Court adopts:

> ... It seems reasonable to impute to Congress an intent to outlaw *all* payments, with certain narrow statutory exceptions, from employer to union officials.... "True, it then covers gifts, however trifling and innocuous, but we can see no reason on that account to narrow its scope. The penalties prescribed make it apparent that they could not have been meant as sanctions for heinous offenses; and Congress may have wished to put a stop to the practice, even on occasions ... harmless in themselves...."

*Ricciardi, supra*, at 99–100 (citing *United States v. Ryan, supra*).

The payment and receipt of money here must be willfully and knowingly done. The word "willfully" means that the person knowingly and intentionally committed the acts which constituted the offenses charged. The word "knowingly" imports only a knowledge of the existence of the facts in question, when those facts are such as to bring the act or omission within the prohibition of the law. The word does not require, as a part of its meaning, that there be any knowledge or awareness that such act or omission is in fact prohibited by law. *Keegan, supra*, at 261.

 Though it may be argued the defendant was coerced into accepting the Mohawk funds and though it may be said he had no place to deposit such money except in the Local 1996 account, he certainly had no trust agreement which is mandated by 29 U.S.C. § 186(c)(5). These contributions may have been made in keeping with the terms of the agreement between the Association and Local 1329, but there is absolutely no evidence that the agreement itself was adopted by Mohawk, Promet, or Local 1996. No analogy can be made to *Arroyo, supra*, because, as I have stated, the payment secured by the defendant in *Arroyo* was an authorized benefit payment pursuant to a qualifying written welfare fund.

*United Marine Division, I.L.A. Local 333 v. Essex Transportation Co.*, 216 F.2d 410 (3rd Cir. 1954) is not apposite either. *Essex* was a civil case based on an alleged agreement between the plaintiff and the defendant employer that it would make payments pursuant to this agreement to six trustees of a welfare fund set up in writing. It is obvious from a reading of the case that these trustees were prepared to accept the payments, though the defendant was not a member of the association administering the funds and so not a party to the contract. The defendant refused to pay the trustees, contending it would be a payment to a representative of his employees as proscribed by 29 U.S.C. § 186(a) and (b). The Court simply held it was not such a payment. The promise was to pay the trustees who were not representatives of employees.

In the case at issue there was no agreement, but even if it were to be argued that Mohawk tried to pay these monies to the Association and so it is inescapable they adopted the trust contract, it does not excuse the defendant. Since there was no agreement as existed in *Essex* neither Promet, Mohawk or the defendant were relieved of the strictures of the statute; in *Essex*, the fear was doing the very thing that was done here. Promet and Mohawk directly paid the defendant who was the employees' representative.

In *Denver, supra*, employers which were not members of or represented by an employers' negotiating association, were allowed over a period of ten years to pay their contributions to the trusts as required by collective bargaining agreements they negotiated with the union. The preamble to the collective bargaining agreement specifically stated:

> The signing of this Agreement by an Employer not a participating member of either Association which incorporates this Joint Agreement by reference and its acceptance by the Union shall bind said Employer to comply with all the terms, conditions and provisions of this Contract and Joint Agreement...

The Court held the statutory requirement was fulfilled even though the non-member employers were not parties to the contract which created the trusts. This is a far cry from the fact pattern before me where there was no written contract; in fact, no meaningful contract could be made because the Association would not be a party to it as in *Denver.*

Language from page 1372 of *Denver* strikes directly at the heart of the reason for this stringent requirement of a contract:

> With respect to the statutory requirement that "payments are to be made as specified in a written agreement," 29 U.S.C. § 186(c)(5)(B), examining the purpose behind the requirement is helpful. The Congressional intent was to allow each employee to know and to have a basis for enforcing his rights, and to eliminate discretion in union leaders to divert the funds. Senator Taft made this clear in discussion on the Senate floor:
>
> Then there is the provisions [sic] under (B) that—"the detailed basis on which such payments are to be made is specified in a written agreement with the employer." So that the purpose of the provision, is that the welfare fund shall be a perfectly definite fund, that its purposes shall be stated so that each employee can know what he is entitled to, can go to court and enforce his rights in the fund, and that it shall not be, therefore, in the sole discretion of the union or the union leaders and usable for any purpose which they may think is to the advantage of the union or the employee.
>
> . . . . .
>
> The purpose of the amendment is to require that the fund shall be established in definite, detailed form, in the form of a trust fund, with respect to which the employees can determine their rights and can insist upon them. 93 Cong.Rec. 4746–4747 (1947).

As applied to this case, the cited language is prophetic; the facts in the present case, without doubt, show that the fund in the Local 1996 account was indeed "in the sole

discretion of the . . . union [leader Raymond Silva] and usable for any purpose [he thought] to the advantage of the union or the employee." The facts show the defendant did use these monies and this fact also destroys the defendant's argument that Local 1996 was merely holding these monies in a "constructive trust."

■ Finally, the defendant argues that the indictment lacks certainty in that it charges the defendant in the disjunctive and therefore "must fall." He argues in his supplemental post-trial brief at page 3 that:

> The indictment charges the defendant as a representative of employees. As a union officer he can be charged under Section 186(b)(1) of Title 29 for receiving a payment which must be prohibited under Section 186(a)(1)(2) or (4). The indictment makes no reference to which subsection of 186(a) the defendant violated. Section 186(a)(1)(2)(3) and (4) are in the disjunctive and must therefore be pleaded in the conjunctive. Having failed to allege a violation of Section 186(a) the indictment must fall. The failure to specify the particular violation of Section 186(a) makes the indictment destitute of the necessary certainty and within the prohibition of the *Donovan* case, 339 F.2d 404 (7th Cir. 1964).

I do not agree. Counts I through VII proscribe one type of illegal activity separately occurring on different dates. The answer to the defendant's argument lies in *United States v. Donovan*, 339 F.2d 404 (7th Cir. 1964), which he cites. At page 408 the court stated that had the counts "charged the defendant as a 'representative of employees' only, the government's argument that such designation serves to identify and confine the offense charged by each of the counts to that of receiving and accepting a payment . . . which employers and certain others are proscribed from making by subsection (1) of amended § 186(a), would not be without merit. But each of the counts in question also identifies and charges the defendant as 'an official of Local 755.' " Here the defendant was charged in Counts I through VII only as the "representative of the employees."

Considering all the facts and circumstances surrounding the defendant's conduct as the union official, I have no reasonable doubt that he has violated Section 186(b)(1) and (d) of Title 29 of the United States Code. I find defendant guilty of Counts I through VII.

### Counts VIII–XIX

The embezzlement counts are based on withdrawals the defendant made from the two Industrial National Bank accounts opened in the name of Local 1996 and for which the defendant was the sole authorized signatory. These counts have certain uncontroverted facts:

1. The funds of Locals 1329 and 1996 were commingled.

2. Both funds consisted of money deducted by the employers from the pay due the longshoremen; these deductions were for welfare, pension, dues, and vacation.

3. Money was withdrawn from the funds by the defendant.

4. In Counts IX, X, XI, and XIV the money withdrawn was used for the benefit of Local 1996–1.

The charge against the defendant is the violation of 29 U.S.C. § 501(c) which reads:

Any person who embezzles, steals, or unlawfully and wilfully abstracts or converts to his own use, or the use of another, any of the moneys, funds, security, property, or other *assets of a labor organization* of which he is an officer, or by which he is employed, directly or indirectly shall be fined not more than $10,000 or imprisoned for not more than five years or both. (emphasis added).

■ Reading this section together with 29 U.S.C. § 402, which defines the various terms, the elements the government must prove beyond a reasonable doubt are:

1. Local 1996 is a labor organization within the meaning of 29 U.S.C. §§ 402(i) and 402(j), that is, a labor organization engaged in an industry affecting commerce.

2. The defendant is an officer of Local 1996 within the meaning of 29 U.S.C. § 402(n).

3. The defendant "unlawfully and wilfully" abstracted or converted to his own use funds of Local 1996.

4. The monies were assets of a labor organization.

Only the third and fourth elements are at issue; ·the first and second are conceded.

■ Excepting as to Counts XVII and XIX, the Court finds that the defendant did use the money he withdrew for Union purposes. He readily admits that certain payments made by him were for personal use, but explains such payments as reimbursements to himself for money he had advanced. I find the government has failed to prove beyond a reasonable doubt that the defendant converted funds of Local 1996 to his own use. The purpose and need for each expenditure the defendant made was explained by him and in no instance do I find that the government proved that Silva used the money for other than Union business. In Counts IX, X, XI, and XIV it is clear the monies were not expended for either Local 1329 or Local 1996, but rather for Local 1996–1. As to each of said counts, the defendant readily acknowledged this. The question then remains does this fact, *i. e.,* spending monies of one union for another, provide the requisite unlawful conversion in that it may be embezzlement for the "use of another."

To begin with, excepting as to Counts XVII and XIX, I find the defendant did not act "unlawfully and wilfully." The definition of willfullness for a crime *malum in se* (as here) is well established—repeatedly the courts have held it requires a finding that the act was committed voluntarily, with knowledge that it is prohibited by law and with a bad purpose to disobey and disregard the law; good faith is a defense. As I see the evidence as to all the "embezzlement" counts excepting XVII and XIX, the government has failed to prove beyond a reasonable doubt that Mr. Silva acted in bad faith.

In *Colella v. United States,* 360 F.2d 792, 804 (1966), the First Circuit Court of Ap-

peals, in a case involving a § 501(c) violation, approved of the following charge:

> As to each count of the indictment, in order to warrant the defendant's conviction, the evidence must convince you beyond a reasonable doubt that the defendant submitted his requests for payment with the *criminal intent* to obtain money which had not been spent for a union purpose and did thereafter use that money for a non-union purpose. (emphasis added).

The court said "... if the jury felt that the defendant had spent for a union purpose, albeit unauthorized, they were to find him not guilty. There is no error in this part of the charge." *Id.* This instructs the trial courts that authorization is not an element of consideration [1] and that an acquittal follows where the expenditure was for a bona fide union purpose. The government concedes as much in its "Government's Supplemental Post-Trial Brief" at page 4 where it states, citing *Colella*, "Thus an acquittal may be had here, on those counts wherein the expenditure was for a bona fide union purpose..." but counters by saying the purpose had to be "of the union whose money was dissipated" and then rests on Silva's own admissions that the monies were used for Local 1996–1, in seeking a conviction on Counts IX, X, XI, and XIV.

The government offers a lengthy citation from the trial court in *United States v. Rubin, M.D.*, Fla.Cr. 75–377 (I have had no access to this case), in part quoting as follows:

Under the terms of this section, Section 501, of the United States Code, Title 29, the defendant, Bernard G. Rubin, *had a separate fiduciary duty to each labor organization of which he was either an officer or an employee.* That duty, or position of trust, encompassed the responsibility of holding the moneys, funds and assets of each organization solely for the benefit of *that organization and its members.*

While this reasoning might be logically correct, in the context of this case, I do not believe a finding of wilfullness can rest on such an analysis. The three unions here had interlocking memberships. Each union was created as extensions of the others, to preserve the longshoremen's jobs; this was necessary since the charter of any one did not include all the various jobs offered at the waterfront. This is important in the consideration of the subjective good faith defense to the charge. I feel I must conclude that the defendant did not act wilfully, and because of the interrelationships of the three unions the use of the money for Local 1996–1 was not a conversion for "the use of another."

For these reasons I would have to and do find the defendant not guilty of Counts VIII, IX, X, XI, XII, XIII, XIV, XV, XVI, XVIII.

 Since this finding does not apply to the remaining Counts, numbers XVII and XIX, I must reach the defendant's contention that all these charges are improper. He argues that § 501(c) applies only to the embezzlement of "assets of a labor organi-

---

1. The Fifth Circuit has drawn a distinction between "authorized" and "unauthorized" use of funds. *See, United States v. Dixon,* 609 F.2d 827, 829 (5th Cir. 1980).

> There are two types of offenses under § 501(c): those involving the authorized use of funds and those involving the unauthorized use of funds. The elements of each differ. In unauthorized use cases the government need only prove lack of proper authorization and fraudulent intent. *U. S. v. Nell,* 526 F.2d 1223, 1231–32 (5th Cir. 1976); *U. S. v. Goad,* 490 F.2d 1158, 1161–62 (8th Cir.), *cert. denied,* 417 U.S. 945, 94 S.Ct. 3068, 41 L.Ed.2d 665 (1974). In cases involving authorized use, however, the government must also prove that the defendant "lacked a good faith belief that the expenditure was for the legitimate benefit of the union." *U. S. v. Bane,* 583 F.2d 832, 835–36 (6th Cir. 1978), *cert. denied,* 439 U.S. 1127, 99 S.Ct. 1044, 59 L.Ed.2d 88 (1979); *see also U. S. v. Santiago,* 528 F.2d 1130, 1133–34 (2d Cir.), *cert. denied,* 425 U.S. 972, 96 S.Ct. 2169, 48 L.Ed.2d 795 (1976).
>
> The use of funds is only "unauthorized" if the defendant had actual knowledge that the expenditures were not properly authorized. *U. S. v. Rubin,* 591 F.2d 278, 282 (5th Cir. 1979). Thus, a good faith belief in union benefit constitutes a defense unless the government can show that the defendant knew that the funds were unauthorized.

---

---

zation," and that the monies here were welfare funds held in trust for the members of Local 1996, to whom they belonged. *United States v. Santiago*, 528 F.2d 1130, 1133 (2d Cir. 1976). He points out that a separate statute, 18 U.S.C. § 664 specifically prohibits the embezzlement of the "funds or assets of a welfare plan." The defendant may be right that these monies should have been preserved for the beneficiaries, but the point is unavailing here. The monies were indeed deducted for welfare, pension, dues, and vacation, but were never the subject of a trust plan. Local 1996 took possession of the funds; such sole possession and control by a labor union that has no formal structure, no written by-laws, no agreement written or otherwise for carrying out a funding plan is inimical to any trust theory. The whole purpose of all these plans is to protect the participants and this in turn requires controls; the entire spectrum of labor law clearly establishes the need to comply with certain requisite features; in addition to what has already been discussed, one can look to 29 U.S.C. § 1102(b)(1), (2), (3), (4) which provides:

> (b) Every employee benefit plan shall—
>
> (1) provide a procedure for establishing and carrying out a funding policy and method consistent with the objectives of the plan and the requirements of this subchapter,
>
> (2) describe any procedure under the plan for the allocation of responsibilities for the operation and administration of the plan (including any procedure described in section 1105(c)(1) of this title),
>
> (3) provide a procedure for amending such plan, and for identifying the persons who have authority to amend the plan, and
>
> (4) specify the basis on which payments are made to and from the plan.

None of these requirements exist in this case; § 664 specifically requires a "welfare plan" and the foregoing are the requisites for just such a plan. This same section, 1102, at (a)(1) further requires that every employee benefit plan must be established and maintained pursuant to a written agreement—no such instrument exists here.

Since Local 1996 has taken possession of the money with unfettered control over it, it must be concluded that the funds are assets of Local 1996, although they were obtained illegally. The charge as brought is correct; I agree with the government that illegally obtained monies can be subject to § 501(c) sanctions. *See United States v. Williams*, 478 F.2d 369, 373 (4th Cir. 1973); *United States v. DeLillo*, 421 F.Supp. 1012, 1015 (E.D.N.Y.1978).

Counts XVII and XIX involve monies the defendant withdrew to purchase a home for himself. On December 11, 1978 he withdrew $3,000 as a down payment and on January 13, 1979 he withdrew $22,600 also to be used toward the purchase of his new home. He tries to justify this by saying that he was authorized by the union and that he repaid the money at 10% interest; that the union got the benefit of interest rather than a bank.

This money was clearly expended for the defendant's personal use and benefit—in no way can I find otherwise. The argument that the organization received the interest does not negate the illegality of the taking. Furthermore, it is clear the defendant did not have authorization of the union membership. The government proved beyond a reasonable doubt that when Local 1996 was organized, the defendant hand-picked his own men as a sort of board of directors. The membership as a whole played no part in this; the only authorization Silva received was from these men—it cannot be said they were spokesmen for the entire union membership. This is a classic case of a zealous union official acquiring virtually complete control of its finances. I conclude no legitimate union purpose was served and that the defendant well knew this when he withdrew the money. He cannot hide behind the authorization given to him by his own ad hoc committee. The government has proved that Local 1996 had no formal union constitution or by-laws authorizing such a loan, that the withdrawal was for the personal benefit of Silva and not for any union benefit (I add there were no formal documents executed such as a re-

corded mortgage to insure repayment of the money), that the defendant well knew the trust imposed upon him with reference to these monies since he served a number of years as a trustee under the Association's trust agreement with Local 1329, that he knew the employees' contributions were to protect the longshoremen. These facts establish beyond a reasonable doubt the requisite wilfullness.

As stated in *United States v. Nell*, 526 F.2d 1223, 1232 (5th Cir. 1976) (citing *United States v. Sullivan*, 498 F.2d at 150):

Section 501(c) fashioned a new federal crime whose scope extends beyond common law embezzlement. *See, e. g., United States v. Robinson*, 2 Cir. 1975, 512 F.2d 491; *United States v. Sullivan*, 1 Cir. 1974, 498 F.2d 146, *cert. denied*, 419 U.S. 993, 95 S.Ct. 303, 42 L.Ed.2d 265. Section 501(a) of the Labor-Management Reporting and Disclosure Act specifically states that officers of labor organizations occupy positions of trust in relation to the organization and its members. The purpose of section 501(c) was "to protect the general union membership from the corruption, however novel, of union officials and employees."

I find the defendant guilty of Counts XVII and XIX.

So Ordered.